**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

________________________________________X

**F.K. and P.K.,** individually, and on behalf of their child, A.K., a minor,

Plaintiffs,

-against-

**Levittown Union Free School District,**
Defendant.

________________________________________X

**Case No. 2:25-cv-1495-JMA-AYS**

Individuals with Disabilities Education Act; N.Y. Educ. Law §4401 *et seq*.

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Benjamin J. Hinerfeld
**Law Office of Benjamin J. Hinerfeld**
9 Stoddard Street
Plymouth, MA 02360
1528 Walnut Street, Suite 1100
Philadelphia, PA 19102
447 Broadway 2nd Floor
New York, NY 10013
(508) 591-0385
Ben@hinerfeldlaw.com

Richard F. Corrao
**Law Office of Susan J. Deedy & Associates**
1600 Stewart Avenue, Suite 609
Westbury, New York 11590
(516) 221-8133
Rcorrao@Susandeedylaw.com

# TABLE OF CONTENTS

**Table of Contents** .......... ii

**Table of Authorities** .......... iii

**I. INTRODUCTION** .......... 1

**II. LEGAL FRAMEWORK AND STANDARD OF REVIEW** .......... 4

a. Free Appropriate Public Education (FAPE) .......... 2

b. Judicial review of New York SRO decisions: Courts only defer to the SRO for certain categories of analysis .......... 6

**III. ARGUMENT** .......... 7

a. The SRO ignored overwhelming evidence of A.K.'s social-emotional regression in 5th grade. The record refutes his finding that A.K. made "adequate progress." .......... 7

b. The District failed to offer A.K. adequate support for 6th grade despite acknowledging that he was likely to fare worse in middle school .......... 12

c. The SRO dismissed A.K.'s social-emotional distress in 6th grade to find that he made "meaningful" progress overall. .......... 14

1. The SRO improperly overturned dispositive credibility findings by the IHO to conclude that A.K. was not in distress at school during 6th grade .......... 14

2. The District inadvertently conceded that that A.K. was in serious emotional distress and that it failed to address his needs .......... 18

3. Dr. Marks's report and testimony show that A.K.'s emotional distress was present in all settings, especially at school. .......... 20

d. The District offered A.K. an IEP for 7th grade that failed to meet his identified needs .......... 24

**IV. CONCLUSION** .......... 28

# TABLE OF AUTHORITIES

## CASES

*Cnty. Sch. Bd. v. Z.P.*,
399 F.3d 298 (4th Cir. 2005) .......... 16

*Coventry Pub. Sch. v. Rachel J.*,
893 F. Supp. 2d 322 (D.R.I. 2012) .......... 3

*C.L. v. N.Y.C. Dep't of Educ.*,
2013 WL 93361 (S.D.N.Y. Jan. 3. 2013) .......... 6

*Davis v. Banks*,
2023 U.S. Dist. LEXIS 170678 (E.D.N.Y. Sep. 25, 2023) .......... 4

*Endrew F. v. Douglas Cnty. Sch. Dist*. RE-1.,
137 S. Ct. 988 (2017) .......... *passim*

*K.R. v. N.Y.C. Dep't of Educ.*,
107 F. Supp. 3d 295 (S.D.N.Y. 2015) .......... 7

*M.H. v. N.Y.C. Dep't of Educ.*,
685 F.3d 217 (2d Cir. 2012) .......... 6, 7, 8

*Moonsammy v. Banks*,
2024 WL 4277521 (S.D.N.Y. Sept. 23, 2024) .......... 6

*NLRB v. Katz's Delicatessen*,
80 F.3d 755, 765 (2d Cir. 1996) .......... 16

*P.P. v. NW. Indep. Sch. Dist.*,
839 F. App'x 848 (5th Cir. 2020) .......... 16

*R.E. v. N.Y.C. Dep't of Educ.*,
694 F.3d 167 (2d Cir. 2012) .......... 6

*V.A. v. N.Y.C.*,
2022 WL 1469394 (E.D.N.Y. May 10, 2022) .......... 6

## STATUTES AND RULES

20 U.S.C. § 1400, *et seq*. (Individuals with Disabilities Education Act) ............................*passim*

20 U.S.C. § 1401 ....................................................................................................5, 6

20 U.S.C. § 1412(a) ....................................................................................................4

8 NYCRR § 200.6(a) ....................................................................................................3

## OTHER REFERENCES

Judith Heumann, *Being Heumann*: An Unrepentant Memoir of a Disability Rights Activist (Beacon Press, 2020) ....................................................................1-3, 28

## I. INTRODUCTION

A young woman is lowered to the sidewalk from her adapted bus and rolls herself towards the front steps, excited for her first day of high school. No ramp. No matter. A few teachers lift her and her wheelchair inside. An exceptional student, she completes her first test before the rest of the class. Thirty minutes remain. She has to pee. Afraid to call attention to herself, she squirms uncomfortably. Her anxiety and discomfort build. The bell rings. She waits as her classmates file out and pushes her chair towards the door. She peers down the unfamiliar hallway. Loud, narrow and crowded, she doesn't see how she'll navigate it. Fortunately, she musters the courage to talk to another girl who then wheels her to the bathroom. As she's ushered along, her eyes waist-level with her new schoolmates, she can't make eye-contact with anyone. And that's a relief. Why make eye-contact? Why see them gawking when she already feels it?

Three years pass. Mostly alone and alienated, suffering daily indignities, she pushes herself to excel academically. When she graduates, she wins an academic award. She arrives with her beaming parents at the local college auditorium for the graduation ceremony. Classmates gather on the elevated stage – caps, gowns, smiles, pats on the back, poses for cameras.

No ramp. No matter. Her dad, an ex-marine, begins to lift her to the stage. Suddenly, the principal rushes over: No no no… we'll give her the award and diploma off-stage. Dad stares down the principal. She WILL be on stage. He lifts her up. Once on the stage, the principal directs her wheelchair to the back, behind her classmates. He calls her name. She wheels herself towards him to accept her diploma and award, but the principal intercepts her before the audience really sees her. With resignation, she takes her diploma and award, goes home with her parents, and looks forward to college.

This is a true story. It happened in mid-1960s Brooklyn before the Civil Rights movement extended its promises to persons with disabilities through the Rehabilitation Act of 1973 and then the Individuals with Disabilities Education Act (IDEA). The young woman was Judith "Judy" Heumann, who went on to become a trailblazer in the Disability Rights movement and key figure in the passage and implementation of those groundbreaking anti-discrimination statutes.[1]

Did Judy Heumann receive a Free Appropriate Public Education (FAPE), as we now define it, in high school? Her school did enough, right? After all, she got good grades, graduated, and went on to college.

Of course not. The school failed to address her disability in the most basic ways, leaving her to fend for herself physically, isolated emotionally, and forced to spend far more physical and emotional energy to succeed than her classmates could imagine. Judy's strength of character to push through such adversity should never excuse our past collective failure; but we rest assured because, with the IDEA and § 504 of the Rehabilitation Act in place, this simply would not happen now….

***

Except it did happen to A.K., a young man with Autism and serious physical and social-emotional disabilities[2] who attended school in Levittown from 2017 to 2023. Able-bodied – he can walk from class to class, sit in a chair, and make his way around the school – he was able to adjust just enough to be promoted each year and get passing grades. However, as explained below, A.K.'s social-emotional disabilities took a heavy toll on him every year as he pushed through the effects

---

[1] *See* Judith Heumann, *Being Heumann: An Unrepentant Memoir of a Disability Rights Activist* (Beacon Press, 2020).

[2] A.K. is diagnosed with autism, anxiety, Obsessive Compulsive Disorder (OCD), Major Depressive Disorder (Moderate), Periodic Fever Aphthous Ulcers Pharyngitis Adenitis (PFAPA), Pediatric Autoimmune Neuropsychiatric Syndrome (PANS), sleep apnea, and epilepsy (causing absence seizures). DE51.

of his autism, OCD, anxiety and major depressive disorder to complete his work. When these very disabilities gave him so much anxiety that he refused to miss class to attend counseling that might help him, the District threw up its hands and essentially said: "We tried."

When A.K.'s parents asked the District to recognize the severity – the very-real-ness – of his social-emotional disabilities, it responded, in effect: Settle for barely enough. A.K. would have to continue in school, with the same ineffectual social-emotional supports, anxious to the point of despondency, because there was little else the school could think to offer.

Just like Judy Heumann's parents, A.K.'s parents asked the District to give him an access ramp – in his case, an Individualized Educational Program (IEP) designed to give him opportunities in school equal to his classmates despite his unique disabilities. The District chose not to do so. But, like Judy's parents. A.K.'s parents did not settle for barely enough.

Impartial Hearing Officer (IHO) Gary Peters recognized that the District defined FAPE too narrowly when it offered A.K. IEPs that placed him in large classrooms with inadequate social-emotional and behavioral support. Citing New York's Education Code (the state's specific codification of the IDEA), he explained the importance of the "social interaction" that "contributes to each student's social growth and maturity."[3] [4] He recognized that FAPE, like anyone's school experience, is more than reading, writing and math. "[A] FAPE should provide for all of a child's special needs, not just academic."[5] IHO Peters' decision enforces the Supreme Court's holding that IEPs be truly individualized and "appropriately ambitious" in light of every child's unique

---

[3] I-30 (citing 8 NYCRR 200.6(a)(3)(i)-(ii)).

[4] Citations to the SRO's official record are as follows: **T-** trial transcripts; **PE -** Parent exhibits; **DE -** District exhibits; **SD -** SRO decision; **I –** IHO decisions; **P -** Parties' SRO pleadings; **S -** supplemental documents; **IE –** IHO exhibits; **CO -** Correspondence. **NOTE:** For hearing transcripts, this brief cites to the SRO's red **T-** citations rather than to the transcripts' black internal page numbers.

[5] *Coventry Pub. Sch. v. Rachel J.*, 893 F. Supp. 2d 322, 334 (D.R.I. 2012) (citing *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1089 (1st Cir. 1993)).

circumstances.[6] For A.K., that meant IEPs aimed squarely at his social-emotional obstacles – goals, specially designed instruction, accommodations, and related services all calculated to meet his unique needs, and designed for him to make meaningful progress in overcoming those obstacles. After an 11-day Due Process hearing, IHO Peters found that the District failed to meet its burden of proving that its IEPs addressed A.K.'s unique needs. Parents had credibly shown that A.K.'s social-emotional distress was real and had long impeded his education. The District had denied him a FAPE.

The State Review Officer (SRO) disagreed. Siloing the District's responsibilities to the purely academic domain, he reversed the IHO's decision. So long as A.K. did not swallow too much water as he kept his head just above the waves socially and emotionally, the District had met its responsibilities. Success in the academic realm was paramount, even if it meant A.K. suffered socially and emotionally.

A.K.'s parents now ask the Court to correct the SRO's unjustifiably narrow interpretation of the IDEA so that it applies to children with disabilities beyond the "academic." A.K.'s social-emotional disabilities are disabilities as real as dyslexia or deafness, even if they are not easily seen by others. In fact, being too anxious and depressed to withstand a school-day – disabilities that a child can mask so that their effects are almost imperceptible – can be a more pernicious obstacle than a physical disability for which there is a straightforward accommodation like a ramp.

## II. LEGAL FRAMEWORK AND STANDARD OF REVIEW

### a. Free Appropriate Public Education (FAPE)

The IDEA offers states federal funding in exchange for their agreement to provide students with disabilities a FAPE.[7] The Supreme Court has explained:

---

[6] *Endrew F. v. Douglas Cnty. Sch. Dist*. RE-1, 580 U.S. 386, 402 (2017).

[7] 20 U.S.C. § 1412(a).

> FAPE, as the [IDEA] defines it, includes 'special education' and 'related services.' 'Special education' is 'specially designed instruction . . . to meet the unique needs of a child with a disability'; 'related services' are the support services 'required to assist a child . . . to benefit from' that instruction. A State covered by the IDEA must provide a disabled child with such special education and related services 'in conformity with the [child's] individualized education program,' or IEP.[8]

The *Endrew F.* court explained that an IEP must be tailored to the child's unique needs and requires "careful consideration of the child's individual circumstances."[9] It rejected the prevailing standard that an IEP give a child the opportunity to make "merely more than *de minimis*" progress and established a "markedly more demanding" standard that requires an educational program to be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."[10]

The IDEA has never made academic disabilities more important than non-academic ones. In fact, of the eleven disability classifications it lists – intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments or specific learning disability – only the last is a truly "academic" classification. The rest address a child's social, emotional, behavioral and physical differences.[11]

The IDEA also helps children develop independence through "transition services," which address both "academic *and functional* achievement."[12] Transition includes "instruction, related services, community experiences, the development of employment and other post-school adult

---

[8] *Endrew F.*, 580 U.S. at 390-91.
[9] *Id.* at 391.
[10] *Id.* at 402-03.
[11] 20 U.S.C. § 1401(3), (30).
[12] 20 U.S.C. § 1401(34)(A).

living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation."[13]

**b. Judicial review of New York SRO decisions: Courts only defer to the SRO for certain categories of analysis.**

New York has a two-tiered IDEA Due Process system. After an IHO issues a decision, an aggrieved party can seek review before the SRO. Then, either party aggrieved by the SRO's decision may file an original action for review in state or federal district court.

Recently, Judge Engelmayer summarized the standard for district court reviews of SRO decisions that depart from IHO decisions:

> When the decisions of an IHO and an SRO conflict, the Court should generally defer to the SRO's decision as the final decision of the state authorities particularly when the state officer's review has been thorough and careful.
>
> But where the district court appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges.[14]

The district court must perform an independent review of the SRO's decision and rule based on the preponderance of the evidence.[15] The deference the court owes to the SRO "will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive."[16] Different aspects of an SRO's analysis merit different degrees of judicial deference:

- No deference on questions of law.[17]
- No deference when the SRO fails to grapple with evidence contrary to its findings of fact.[18]

---

[13] 20 U.S.C. § 1401(34)(C).
[14] *Moonsammy v. Banks*, 23 Civ. 10491 (PAE), 2024 WL 4277521, at *6 (S.D.N.Y. Sept. 23, 2024) (quoting *R.E. v. N.Y.C. Dep't of Educ*., 694 F.3d 167, 189 (2d Cir. 2012)) (quotes omitted).
[15] *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012).
[16] *Id*. at 244.
[17] *V.A. v. N.Y.C.,* No. 20-CV-0989(EK)(RML), 2022 WL 1469394, at *5 (E.D.N.Y. May 10, 2022).
[18] *C.L. v. N. Y. City Dep't of Educ*., 12 Civ. 1676 (JSR), 2013 WL 93361 (S.D.N.Y. Jan. 3, 2013).

- Little deference to the SRO when it interprets objective indications of progress.[19]
- Little deference to the SRO when it challenges the IHO's findings by relying on documents that lack foundation or testimonial corroboration.[20]
- More deference to the SRO when it has greater familiarity with the evidence and witnesses than does the reviewing court.[21]
- More deference to the SRO when it makes decisions about an IEP's educational methodology.[22]

As discussed below, applying this review framework, the SRO's decision here is entitled to little deference because it was not "grounded in thorough and logical reasoning." It took an improper, dismissive position on A.K.'s unique social-emotional disabilities.

## III. ARGUMENT

### a. The SRO ignored overwhelming evidence of A.K.'s social-emotional regression in 5th grade. The record refutes his finding that A.K. made "adequate progress."

The SRO reduced A.K.'s social-emotional regression in 5th grade (2020-2021) to 16 inaccurate words: "***Despite mental health difficulties displayed at home and the student's reported refusal to use coping strategies***…"[23] This dismissive phrase ignores indisputable evidence that A.K. was in emotional crisis throughout 5th grade. Then, to show that A.K. purportedly made "adequate progress" in 5th grade, the SRO cited just six pages of a 2100-page record,[24] ignoring overwhelming evidence of his regression. Because the SRO was interpreting

---

[19] *M.H.*, 685 F.3d at 244.

[20] *K.R. v. N.Y.C. Dep't of Educ.*, 107 F. Supp. 3d 295, 308 (S.D.N.Y. 2015) ("There was no testimony regarding the minutes from any witness, and thus no basis to determine whether the minutes were an accurate representation of what occurred at the meeting, whether the minutes were contemporaneously taken, or indeed, who wrote the minutes. Without such a foundation, it was improper for the SRO to rely on the minutes to reject the IHO's conclusion that the father's testimony regarding what happened at the meeting was accurate.").

[21] *M.H.*, 685 F.3d at 244.

[22] *Id.*

[23] SD11 (emphasis added).

[24] *See* SD12-14 (reciting details from A.K.'s 2020-2021 report card (DE132-33) and 2020-2021 progress report. (DE134-37)).

recorded "indications of progress" that the Court can interpret just as competently, and failed to grapple with evidence that undermined these reports, the Court owes his analysis no deference.[25]

Throughout 5th grade, Mrs. K communicated with the East Broadway School staff to try to make A.K.'s days bearable. Unfortunately, A.K.'s social-emotional problems lasted throughout 5th grade. Everyone at East Broadway agreed that he struggled and had even regressed. The following interactions show why the SRO was wrong to dismiss A.K.'s social-emotional difficulties in 5th grade:

- **Sept. 25, 2020 –** School Psychologist, Dr. Noreen Vail-Gandolfo reported internally: "Spoke with parent regarding A.K.'s transition back and anxiety levels. A.K. expressed to parent having no friends and feeling lonely." DE142.

- **Oct. 20, 2020 –** 5th grade special education teacher Laura Gerken wrote to Mrs. K:

  > A.K. is having a hard time again today. Very frustrated, breaking pencils, ripping paper etc. We went for a walk, he kicked the walls. I stopped at Dr. Rust's office and he was able to kick and punch his punching bag, which seemed to help. When we returned to class he needed another break. I asked him to leave the class because he snapped his pen in half and all of the pieces went flying, which could have potentially hurts someone. PE54-55.

- **Oct. 21, 2020 –** District social worker Danielle Bantileskas: "Yesterday, in my office, he ripped the paper without discussing his feelings and then returned to the classroom on his own. He wasn't really ready yet and proceeded to rip more paper in the classroom. PE53

- **Nov. 25, 2020 –** When Mrs. K asked Gerken whether A.K. acts out all the time or just in her class, she responded: "***I feel like it is all the time***. I will reach out to everyone and see what we can come up with." PE57 (emphasis added).

- **Jan. 27, 2021 –** Gerken to Mrs. K: "Mrs. Hepworth handed out some extra photos of class events. A.K. cut himself out of the pictures and attempted to throw them away...." PE65-66.

- **Mrs. K responded**:

  > I spoke to A.K. … and he says he doesn't want any friends and he doesn't want to get married. That's effectively why he cut himself out of the pictures…. In any case Mrs. Gerken, I, and even [private therapist] Dr. Jodi

[25] *M.H.*, 685 F.3d at 244.

> are seeing significant regression socially with him.… I am really worried about the transition to middle school for A.K. PE65.

- **Bantileskas to Mrs. K:**

> He was rocking the desk and I reminded him about how painful it would be for the other group member if it fell on them... He was very resistant to any participation including the drawing of the Pikachu. He just scribbled and tore it up…. Dr. Vail is seeing similar responses. He is very angry when he has to leave class and continues his anger into the group time. PE71-72

- **Mar. 5, 2021 –** Vail wrote: "A.K. has been coming with me although he has not wanted to stay for more than a few minutes and does not like to miss anything in class." PE78.

- **Gerken wrote**:

> Mrs. K, I find it very difficult to compare A.K. last year to this year as the circumstances are so dramatically different. He is the same in some ways (not wanting to accept my help or suggestions, being too hard on himself, overreacting to constructive criticism). The ways I see him as different is the 'closing in' of himself within his desk/shield…. PE77.

- **March 8, 2021 –** Bantileskas to Mrs. K:

> Thank you for always being A.K.'s best advocate. I love that you can deep dive into so many aspects of his personality. It is amazing how as a parent we grow to learn and know our children so well.
>
> I have already briefed Dr. Rust on A.K.'s frustration with pull outs and regression this year. We will definitely come up with a supportive plan.[26]

- **March 22, 2021 –** Mrs. K: "I know he has been resistant to go to sessions with Dr. Vail and Mrs. B and when he does go, he's at times rude, defiant and unsafe. All big red flags for A.K. signaling he is not ok."

- **Apr. 19, 2021 –** Bantileskas:

> … I wanted to let you know that A.K. refused group counseling again on Friday. I asked him to come but he still refused. I wanted to see how you want to proceed further…. PE93-94.

Largely ignoring this evidence, the SRO cherry-picked positive passages from A.K.'s generic 5th grade report card and progress report – ignoring negative ones – to conclude that A.K.

[26] PE75 (emphasis added).

was doing fine socially and emotionally. SD12-14. For instance, he extracts a positive comment from A.K.'s first-trimester report card – "A.K. is adjusting well to our 'new normal'"[27] – easily refuted by the emails, above, which report that A.K. was lonely and anxious (DE142.), kicking and ripping paper off the walls (PE54), and "acting out" "all the time." PE57. The SRO did not even try to square these conflicting narratives.

He then selected rosy third-trimester report card statements that "the teachers loved watching the student progress that year," and "[a]ccording to teacher comments, the student became a hardworking, more intrinsically motivated student and is [sic] performance across all academic areas has been wonderful."[28] Again, he ignored that these reports omit how A.K. constantly struggled socially and emotionally, as contemporaneous emails confirm.

The SRO also ignored A.K.'s academic deficits in 5th grade, again focusing on inaccurate report cards to conclude that he had excelled. For example, he observed that A.K. received a grade of 3 in "Draws conclusions and makes inferences using details from text," a 3+ in "demonstrates knowledge of literacy skills to enhance reading comprehension," and a 3 in "engages effectively in a range of collaborative discussions."[29]

But A.K.'s deficits in reading comprehension, drawing inferences, and collaborative discussion were well established. His April 2021 IEP details all three serious deficits:

> ***A.K. demonstrates a relative weakness with drawing conclusions and making inferences.*** When reading, A.K. will often read to find the rote answer rather than looking for the deeper meaning within the text. A.K. needs to be a more active reader. When answering inferential comprehension questions, especially with a non-preferred text, A.K. tends to focus on finding answers to specific questions (on a test or worksheet for example) causing him to be a passive reader. He quickly "scans" a text, looking only for the answers he thinks he needs to find.…[30]

---

[27] SD12 (quoting DE133)
[28] SD13 (quoting DE133).
[29] SD-12 (citing DE132).
[30] DE24.

With respect to collaborative discussions, the IEP reports that A.K. struggled:

> A.K. has had a difficult year in social skills group. A.K. had a difficult adjustment back to the new school year. He indicated missing his class from last year and not being able to identify friends in this new class. He would often refuse to attend group and if he did attend he would rip up papers, bring other work to do in session or bang or rock the desk. A.K. was given the opportunity to change his group time to a more desirable peer group and different time. He refused. He does not like to miss classwork for group. A.K. has mentioned on multiple occasions that he feels he does not need the group and doesn't want friends. When A.K. is engaged in group he is able to give good insight to his peers. He likes to share his interests and wants to give guidance to others.[31]

Just a day before the April 20, 2021 Committee on Special Education (CSE) meeting, Ms. Gerken told Mrs. K that she would add inferencing and reading comprehension goals to A.K.'s 2021-2022 IEP. PE102.[32]

Teachers will sometimes inflate grades to bolster a student's self-esteem. Here, the SRO clearly erred by citing A.K.'s inflated grades as evidence that he made adequate academic progress in 5th grade while failing to grapple with conflicting emails, testimony and other documents. This is just one clear example of the SRO's selective, inaccurate review of the record. The Court need not defer to the SRO's clearly erroneous findings that A.K. made adequate progress in 5th grade. The SRO ignored that A.K. had to battle his long-standing social-emotional demons just to make it through the year.

---

[31] DE26.

[32] A.K.'s deficits in inferencing, comprehension and group work went back years in fact. His May 2020 IEP states: "A.K. ***has difficulty making inferences and drawing conclusions.*** This makes answering inferential comprehension questions a struggle for him. When completing a reading task, A.K. tends to focus on finding answers to specific questions (on a test or worksheet for example) causing him to be a passive reader. He quickly "scans" a text, looking only for the answers he thinks he needs to find." That May 2020 IEP, in turn, reproduced test scores from January 2019 showing reading comprehension as an outlying low score in the 40th percentile, where A.K.'s full scale IQ was in the 99th percentile and his other academic scores fell in the mid-to-high 90s. DE38-39.

While the District offered A.K. a ramp in 5th grade – individual and group counseling – for him to gain social-emotional access to school it became obvious that he could not actually use it. Something had to change.

**b. The District failed to offer A.K. adequate support for 6th grade despite acknowledging that he was likely to fare worse in middle school.**

On April 20, 2021, the CSE met to write A.K.'s 6th grade IEP. What was its job? To address the problems that made A.K.'s 5th grade experience so difficult and miserable.

A.K. was moving from East Broadway to the Jonas Salk Middle School (Salk), a much larger school, for 6th grade. Throughout 5th grade, Mrs. K and the East Broadway staff struggled to get a handle on his social-emotional and academic problems.[33] He had been sad and deeply anxious about leaving East Broadway all year. For example, on March 22, 2021, Mrs. K wrote to the East Broadway staff:

> He has cried intermittently and unexpectedly over the last few days mainly over changing anything in his room (which we were not even talking about) and missing the six months during the pandemic when he was home and created his own 'routine'. He has also cried over leaving East Broadway. PE87.

On April 8, she wrote that his anxiety was affecting his grades:

> I see his anxiety levels building around school and schoolwork and I know that he is dreading leaving East Broadway. I have also noticed some failing grades for some social studies or reading comprehension assignments that I am concerned with as I see his literal thinking coming through his writing at times. PE89.

On April 12 and again on April 19, 2021, in preparation for the upcoming CSE meeting, she emailed the team her concerns about A.K.'s transition to Salk:

> We are trying to determine if Salk is the appropriate placement for A.K. given his current functioning levels. An unacceptable placement for us would be one where his social / emotional health is at risk of further degradation. We recognize that we may not be able to fully mitigate that risk in any placement but it must be a priority.

[33] *See* PE51-99.

> His social emotional health is very much linked to his academic performance and his ability to allow himself to access much needed services. I am very interested in how the support structure at Salk and the school day are designed to meet his specific needs. PE97.

She then asked specific questions about how Salk would accommodate A.K. – what class options were available; did students move around in a cohort; how was Salk's special education team designed, who would offer group and individual counseling; would A.K. have to miss instruction to attend counseling; and had Salk worked with kids who had similar anxieties about transition?[34] Everyone knew A.K.'s transition to Salk would be rough. Mrs. K was making sure the team would do all that was possible to make his 6th grade experience better than 5th grade.

During the April 20, 2021 CSE meeting, the CSE proposed to place A.K. in instructional co-teaching (ICT) classes for 6th grade, similar to his placement for 5th grade. DE21. The CSE offered A.K. individual counseling, but no group counseling. According to Mrs. K, she was told that Salk only provided group counseling with a guidance counselor "at the building level,"[35] not as part of an IEP. T1124.[36] The CSE did not recommend any goals that a guidance counselor might work on with the group. T1131:21-1132:8.

Mrs. K testified that she was concerned that A.K. would be overwhelmed by the new structure of middle school, with children moving from one class to another. T1125:15-19, 1127:18-22. Given how difficult it was for A.K. to adjust to school after the COVID pandemic, she worried that he would have serious issues transitioning to Salk. T1126:6-20.

A.K. also suffers from disfluency that causes him embarrassment when he struggles to express himself. T1130:11-20. So, Mrs. K asked the team how Salk would address his disfluency and pragmatic language skills. The CSE said that it did not provide speech therapy solely for

[34] PE98.
[35] This means service provided to any student regardless of whether they have an IEP.
[36] A year later, the school did offer A.K. group counseling in his IEP. DE4.

pragmatic skills deficits. Since he had no other speech needs, he would not receive that service. T1130:8-1131:7. When Mrs. K asked how they might address A.K.'s emotional dysregulation and problem behaviors, the CSE said it was on a case-by-case basis T1129:3-16.

In sum, the rather than offering A.K. more support as befitting his attendance at a new, large school, the team offered an IEP that *reduced* his services.

**c. The SRO dismissed A.K.'s social-emotional distress in 6th grade to find that he made "meaningful" progress overall.**

Unsurprisingly, A.K. had another miserable year in 6th grade. Much as with 5th grade, however, the SRO held that because A.K. got passing grades, he made meaningful progress – summing up his conclusion with the phrase "***despite the frustration that the student expressed to the parent at home.***"[37] The SRO again dismissed a year of A.K.'s severe distress in one inaccurate half-sentence. He came to this conclusion improperly, however. And the SRO's implausible claim that A.K. only felt serious distress at home, and not at school, falls apart under the lightest scrutiny and common sense.

**1. The SRO improperly overturned dispositive credibility findings by the IHO to conclude that A.K. was not in distress at school during 6th grade.**

The SRO justified his conclusion that A.K. only felt distress at home – not at school – in part by improperly overturning dispositive credibility findings by the IHO. To do so, he claimed to be doing something else entirely: assigning different weight to the evidence. As explained below, the SRO was only able to "re-weigh" the evidence by improperly assigning weight to testimony that the IHO had deemed non-credible.

In finding that the District denied A.K. a FAPE for 6th and 7th grades, the IHO drew three factual findings about A.K.'s experience during 6th grade:

[37] SD20-21 (emphasis added).

1. The District's program caused A.K. significant emotional distress which continued throughout the school year.

2. The District failed to recognize from the beginning of the school year that A.K. was having significant emotional distress in the District's program.

3. The District's attempts to provide accommodations in the same placement were ineffective and he continued to suffer throughout the year.[38]

These are factual findings. They are dispositive here because it was a rather straightforward denial of FAPE for the District to offer A.K. a program in 7th grade that had caused him significant emotional distress in 6th grade, and whose accommodations were ineffective.

Unfortunately, the SRO rejected these three factual findings under the guise of assigning them different weight than the IHO did. He justified this decision – inexplicably, in a footnote – by declaring that the IHO made no credibility findings "and rather afforded more weight to certain evidence presented." SD22 n.25. "Accordingly," he added, "to the extent that I disagree with the IHO's findings of fact, ***it is based on the weight of the evidence, not specific findings by the IHO that one or more of the witnesses specifically failed to offer credible testimony***." *Id.* (Emphasis added).

The SRO is wrong in two ways. *First*, the IHO did make explicit credibility findings. Specifically, he deemed Mrs. K credible, starting several of his conclusions of law with the following statements:

- "I agree with Parent…" I-32.
- "The Parent stated that her son was having difficulties…" I-33.
- "The Parent testified that she was informed by the District…" I-34.
- "The Parent testified that her son received counseling services…" I-34.
- "The Parent expressed concerns…" I-34.
- "The Parent testified that Ms. JJ said…" I-35.

[38] I-32.

He did not have to add "and I find her statement credible," because that was plainly implied by context for each proposition. Whether explicitly or not, he plainly credited Mrs. K's testimony that A.K was experiencing significant emotional distress at school, along with the many other significant facts to which she testified. Mrs. K was a credible witness.

*Second*, the SRO owed deference to the IHO's *implicit* credibility findings. After laying out the two sides' conflicting stories,[39] the IHO believed Parents' story, not the District's. In reaching this judgment, he made implicit credibility findings in their favor.[40] From the Second Circuit:

> When ... a trial court fails to render express findings on credibility but makes a ruling that depends upon an implicit determination that credits one witness's testimony as being truthful, or implicitly discredits another's, such determinations are entitled to the same presumption of correctness that they would have been accorded had they been made explicitly.[41]

For example, setting out one **District** position from the testimony of District Special Education Chairperson, Julie Joshuakutty, the IHO wrote:

> On December 2, 2021, the Parent told the school that she believed that her son had a lot of negative feelings about school (D-25, p.2; 6/15/23 Tr. 13-15). The school psychologist advised that, to the contrary, the Student was complying with tasks, adjusting to the new school environment, participating in class and becoming accustomed to the classroom routines.[42]

---

[39] The SRO appears to criticize the IHO for reciting facts based on each party's closing briefs. SD5, n.8 (citing I-9-29). It is unclear why this was improper. The SRO's own decision recites pages of rote facts with no obvious bearing on a finding or holding.

[40] *See, e.g., NLRB v. Katz's Delicatessen,* 80 F.3d 755, 765 (2d Cir. 1996) ("[I]mplicit credibility resolutions are appropriate where an ALJ's treatment of the evidence is supported by the record as a whole."); *Cnty. Sch. Bd. v. Z.P.*, 399 F.3d 298, 306-07 (4th Cir. 2005) ("We have held that credibility determinations implicit in a hearing officer's decision are as entitled to deference under *Doyle* as explicit findings."); *P.P. v. NW. Indep. Sch. Dist*., 839 F. App'x 848, 858 (5th Cir. 2020) ("The hearing officer's reliance on testimony from P.P.'s teachers, as opposed to testimony from P.P., reflects an implicit credibility determination that is owed deference.").

[41] *Katz's Deli*, 830 F.3d at 765 (quoting *Lavernia v. Lynaugh*, 845 F.2d 493, 500 (5th Cir. 1988)).

[42] I-16 (citing D-25, p.2, 6/15/23 Tr. 13-15)).

Then, setting out **Parents'** *contrary* position, based on Mrs. K's testimony and a December 2, 2021 email to Joshuakutty, the IHO wrote:

> On December 2, 2021, [Mrs. K] notified the school staff to advise that her son was having trouble remembering to go to band practice because of organization issue. She testified that, at that time, he was having a lot of difficulty with stressors and high anxiety levels.[43]

The IHO had to make a straightforward credibility finding: Was Mrs. K right that A.K. was dealing with stressors and anxiety in school, or was Joshuakutty right that, "to the contrary," he was adjusting to the new school environment? The two positions are contrary, incompatible.

Credibility decisions like this one are exactly why parents need Due Process hearings. The District has more staff at CSE meetings, more witnesses, and greater resources than parents have. But the IDEA gives parents a leveling force: the ability to testify, tell their story, and counter the District's story. The IDEA entrusts an IHO to decide whether their story is true.

Here, the IHO believed Mrs. K. He found that "[t]he District's program caused A.K. significant emotional distress, which continued throughout the school year" I-32. This finding – ***Yes, A.K. experienced serious emotional distress in 6th grade*** – can only be squared with Mrs. K's claim not Joshuakutty's. He made an implicit credibility determination: Mrs. K was credible and Joshuakutty was not.

Given this finding by the IHO, the SRO was not allowed to assign "weight" to Joshuakutty's testimony, which the IHO found non-credible, let alone assign more weight than he did to Mrs. K's testimony, which the IHO credited. Unfortunately, he did just that. Dismissing Mrs. K's account, he credited the District's version of events: "[T]the student was able to navigate

[43] I-26 (citing T. 74-75 (12/05), Ex. OO).

the middle school building, always got to class on time, and although the parent reported a lot of frustration and anxiety at home, the student 'held it together' at school." SD-19. [44]

The Court should reverse the SRO's decision to usurp the IHO's role in determining witness credibility.

**2. The District inadvertently conceded that that A.K. was in serious emotional distress and that it failed to address his needs.**

The IHO found that A.K. was in serious emotional distress in 6th grade. Inadvertently, the District's own witness confirmed this fact, while simultaneously conceding that the District failed to address his needs. District psychologist Barbara Montiero-Grady testified about A.K.:

> He always got to class on time so although that caused him anxiety, it didn't impact his ability to arrive to class on time. He was able to cope, ***even when he was at school he held it together.***
>
> You could see that at home Mrs. K reported a lot of anxiety and frustration and I think part of it is because he held it together at school all day, ***he was doing what he was supposed to do***.[45]

In other words, Grady did observe A.K.'s signs of anxiety. But she and her colleagues preferred that A.K. bottle it up at school and explode when he got home, rather than express his feelings in school so that school personnel might be able to help him. When A.K. stated in a questionnaire that he wanted to kick his aunt's dog, Ms. Grady, rather than seeing that as a sign of distress and cry for help, put a less negative spin on it, explaining that A.K. was simply struggling to express that he was afraid of dogs. T239:13-240:11.

Grady and others at the school simply didn't want to believe that there was a biological or disability-related basis for A.K.'s distress, that it was real. She stated this expressly in a remarkably candid exchange on cross-examination:

---

[44] Begging the larger question of whether something is truly "held together" if it explodes each night.
[45] T214:16-24 (emphases added).

> Q. You said he didn't have difficulty transitioning compared to other students who were having difficulty transitioning to the middle school, correct?
>
> A. Yes.
>
> Q. But he did have difficulty transitioning to the middle school, correct?
>
> A. Based on his report of how he felt, yes.
>
> Q. And that's the report that you were going by figuring out whether or not he was have a difficult time, correct?
>
> A. That's the disconnect between what we are observing versus what he is reporting and feeling. His perception is his reality, that's what he feels and I would never minimize a student's perception and feelings. If that's how he felt, that's how he felt, and that's his reality. On the other hand, what we observed is our reality and that's why I say he had a difficult transition because he reported having a difficult transition. Mrs. K reported to us he's going home and crying, so I empathize. However, at school, we're not seeing him having those meltdowns so we understand that his transition was difficult because he was verbalizing I don't like the school, I don't want to be here, I miss my elementary school; however, he was coping, he was managing. He was making progress throughout the year.[46]

His 6th grade counselor, Ms. Williams expressed a similar sentiment in Spring 2022, essentially saying that A.K. needed an attitude adjustment:

> Mrs. Williams, school social worker, reported that A.K.'s adjustment to middle school has been a slow process. He has been observed increasing his comfortability with his teachers. This is evidenced by him speaking more with his teachers and advocating for himself. ***In counseling he will admit that a school related activity is "pretty good" but will catch himself and then make a negative statement about school.*** A.K. continues to struggle to recognize the impact his self-concept has on his experiences. A.K. expresses that the school expects too much of him and does not feel that these expectations are fair. In counseling, the focus has been on how a positive attitude can affect behavior. A.K. also struggles to reframe perceived negative situations in order to have a more beneficial social-emotional experience in the school setting.[47]

Rather than take his social-emotional disability seriously, the District's posture towards A.K. – a child diagnosed with, among other things, autism, seizure disorder, generalized anxiety, OCD, and Major Depressive Disorder – was, in effect, don't be sad, A.K. Be positive! It is hardly

[46] T271:19-273:1.
[47] DE18 (emphasis added).

an exaggeration to say that this was like telling young Judy Heumann: "Get up out of that wheelchair, Judy! You can walk!"

**3. Dr. Marks's report and testimony show that A.K.'s emotional distress was present in all settings, especially at school.**

A.K. was not merely "frustrated" at home, as the SRO asserts, he was entirely despondent about having to go to Salk. Dr. David J. Marks evaluated A.K. and issued a neuropsychological report in November 2021 (along with an updated report in May 2022). DE51-74. Marks described a young man dealing with problems typical of children with high-functioning autism. For example, he struggled to make same-age friends and to take others' perspectives. T709:5-710-25. He had difficulty understanding non-literal language. T710:13-25. He had difficulties with inflexibility and emotional control. T698:18-22. He had difficulty with inferential reading despite being proficient in the mechanics of reading. DE70.

Dr. Marks' report shows that at least four of A.K.'s 6th grade teachers recognized his distress. They completed questionnaires for the Behavior Assessment System for Children-Third Edition (BASC-3). Summarizing their responses, Marks wrote:

> Although somewhat varied across respondents, ratings obtained from A.K.'s teachers indicated significant internalizing symptoms (Anxiety, Depression, Withdrawal) along with weaknesses in Adaptive Skills (Adaptability, Social Skills, leadership, Activities of Daily Living, Functional Communication) and compromised peer relations. DE69-70.

Although he cites other pages from Marks' report, **the SRO inexplicably omits that A.K.'s teachers rated him as "At-Risk" or "Clinically Significant" in each of the following areas**: anxiety, depression, withdrawal, adaptability, social skills, leadership, functional communication, internalizing problems, behavioral symptoms index, and adaptive skills, as seen in the tables from Dr. Marks' report, below:[48]

[48] DE67-68.

Behavioral and Social-Emotional Functioning: Teacher Report

| Behavior Assessment System for Children, Third Edition (BASC-3) – Teacher Report | | | | |
|---|---|---|---|---|
| | Teacher 1 - Maher | | Teacher 2 - Stanton | |
| CLINICAL SCALES | T-Score | Range | T-Score | Range |
| Hyperactivity | 42 | Average | 43 | Average |
| Aggression | 49 | Average | 49 | Average |
| Conduct Problems | 44 | Average | 41 | Average |
| Anxiety | 75 | Clinically Significant | 73 | Clinically Significant |
| Depression | 77 | Clinically Significant | 61 | At-Risk |
| Somatization | 43 | Average | 47 | Average |
| Attention Problems | 59 | Average | 45 | Average |
| Learning Problems | 52 | Average | 42 | Average |
| Atypicality | 57 | Average | 55 | Average |
| Withdrawal | 68 | At-Risk | 73 | Clinically Significant |
| ADAPTIVE SCALES | T-Score | Range | T-Score | Range |
| Adaptability | 31 | At-Risk | 43 | Average |
| Social Skills | 34 | At-Risk | 44 | Average |
| Leadership | 36 | At-Risk | 45 | Average |
| Study Skills | 48 | Average | 59 | Average |
| Functional Communication | 36 | At-Risk | 51 | Average |
| COMPOSITES | T-Score | Range | T-Score | Range |
| Externalizing Problems | 45 | Average | 44 | Average |
| Internalizing Problems | 69 | At-Risk | 63 | At-Risk |
| School Problems | 56 | Average | 43 | Average |
| Behavioral Symptoms Index | 61 | At-Risk | 55 | Average |
| Adaptive Skills | 35 | At-Risk | 48 | Average |

| Behavior Assessment System for Children, Third Edition (BASC-3) – Teacher Report | | | | |
|---|---|---|---|---|
| | Teacher 3 - Kost | | Teacher 3 - Schum | |
| CLINICAL SCALES | T-Score | Range | T-Score | Range |
| Hyperactivity | 43 | Average | 45 | Average |
| Aggression | 49 | Average | 53 | Average |
| Conduct Problems | 46 | Average | 49 | Average |
| Anxiety | 60 | At-Risk | 70 | Clinically Significant |
| Depression | 72 | Clinically Significant | 82 | Clinically Significant |
| Somatization | 51 | Average | 43 | Average |
| Attention Problems | 48 | Average | 54 | Average |
| Learning Problems | 46 | Average | 56 | Average |
| Atypicality | 60 | At-Risk | 53 | Average |
| Withdrawal | 73 | Clinically Significant | 75 | Clinically Significant |
| ADAPTIVE SCALES | T-Score | Range | T-Score | Range |
| Adaptability | 43 | Average | 31 | At-Risk |
| Social Skills | 35 | At-Risk | 29 | Clinically Significant |
| Leadership | 34 | At-Risk | 29 | Clinically Significant |
| Study Skills | 51 | Average | 36 | At-Risk |
| Functional Communication | 38 | At-Risk | 28 | Clinically Significant |
| COMPOSITES | T-Score | Range | T-Score | Range |
| Externalizing Problems | 46 | Average | 49 | Average |
| Internalizing Problems | 64 | At-Risk | 69 | At-Risk |
| School Problems | 47 | Average | 56 | Average |
| Behavioral Symptoms Index | 59 | Average | 63 | At-Risk |
| Adaptive Skills | 39 | At-Risk | 27 | Clinically Significant |

These BASC questionnaire answers were based on the teachers' direct observations of A.K. at school, and they rebut the SRO's implausible conclusion that A.K. had only showed "frustration" at home. The teachers' scores on the Behavior Rating Inventory of Executive Function, Second

Edition (BRIEF-2), similarly showed that A.K. fell in the Clinically Elevated or Potentially Clinically Elevated ranges in Emotional Control, Emotional Regulation, and Shift between mental sets/concepts. DE62-63.

Dr. Marks, whose testimony the IHO cited with approval,[49] further observed that "those around him were uniformly aware of what he was enduring emotionally." T721:21-23. A.K.'s self-reporting showed substantial distress, and indicated that A.K. felt "little means to exact any influence on what was happening around him." T714:19-715:19. While A.K. might have appeared successful at school, any such success was far more effortful than in the past by Spring 2022: "[H]e needed to mobilize more resources in order to achieve the same outcomes, that had become increasingly hard for him to do." T721:7-15. The increased difficulty in school work was "to the detriment of his confidence and self-esteem." DE70. A.K. was "very demoralized about his situation." T722:6-7.

And A.K.'s social-emotional struggles bled into the academic realm. Marks explained that A.K.'s newly developed emotional burdens (in conjunction with increased seizure activity) "altered his needs as a learner." DE71. He explained:

> Without a doubt, [A.K.] has become palpably demoralized about his educational experience; this appears to reflect a loss of familiarity around his elementary school, but also the more effortful nature of academics over time. As attention turns toward the future, [A.K.] would invariably benefit from a more specialized educational program (described below) along with continued therapeutic support.[50]

He continued:

> While he has managed academically since transitioning to middle school, he is highly distraught and socially disconnected. In this way, his ability to remain afloat academically has occurred at a significant social-emotional cost. This is critically important, as his dissatisfaction with school has been corrosive with respect to his self-esteem and outlook for the future. When his overall wellbeing (as opposed to educational attainment in isolation) is used to determine the goodness-of-fit of his

[49] I-33, 35.
[50] DE71.

scholastic milieu, his need for a more therapeutic educational setting becomes more immediately apparent.[51]

No plausible reading of the record in its totality could suggest that A.K. was not showing serious emotional distress in school throughout 5th and 6th grades. As the IHO held: (1) the District's program caused that distress; (2) the District failed to recognize it; and (3) the District's accommodations were ineffective in addressing it. I-32.

The District also failed to provide A.K. individual counseling services as recommended in his IEP. Mrs. K testified that A.K. stopped receiving counseling services from Mrs. Williams in March 2022. T1359:17-24. The 2021-2022 IEP progress report corroborates Mrs. K's account, noting that "[s]ince March, there has been increase in his resistance to attending counseling sessions" and that "[t]here has been increase in non-compliance over the last 2 months." DE131.

Rather than confirm the straightforward IDEA violation that the District was not providing a service listed on A.K.'s IEP for two months, the SRO – again, in a footnote – excused its failure to complete A.K.'s counseling services in 6th grade on the grounds that they "were available to the student but were not being taken advantage of." SD24. Passive voice notwithstanding, ***the SRO blamed A.K. for the District not implementing his IEP***. This is yet another example of the SRO dismissing non-"academic" aspects of Special Education. With the District removing group counseling from A.K.'s 6th grade IEP, weekly individual counseling was effectively the last Special Education service remaining. A.K.'s refusal to go to counseling was obviously linked to his social-emotional disability: anxiety about missing class. The very point of individual counseling was to address such anxieties.

It was therefore incumbent on the District to seek another way to provide A.K. with this crucial service. Mrs. K testified that A.K. and his counselor, Mrs. Williams, did not have a good

[51] DE71-72.

rapport, and that Williams did not bother denying it, reportedly saying: "If A.K. is done with me, we can explore who else can do counseling with him." T1346:7-20.

The law did not permit the staff at Salk to collectively throw up their hands and say: *We don't know how to implement A.K.'s IEP. We give up.* They had an obligation to try something else, and then try again, until something worked.

Imagine a school district, unsuccessful using a specific reading intervention to instruct a dyslexic child, deciding that teaching the child to read was too hard and it was not going to look for a different, more effective intervention. No court would drop a footnote (1) blaming the child for being unable to read and (2) excusing the district for giving up on him. The SRO's ratification of the District's negligence towards A.K. is inexcusable.

The Court should not defer to the SRO's factual and categorical dismissal of A.K.'s social-emotional disability. His factual finding impermissibly discards the IHO's credibility determinations, and his legal conclusions disregard the IDEA's mandate to evaluate the whole child and treat social-emotional disabilities – however intangibly they may present – as seriously as academic and visible physical disabilities. The IHO correctly held that A.K. was denied a FAPE for 6th grade.

In light of A.K.'s continued lack of progress in 6th grade, the District had an obligation to make serious changes to his IEP for 7th grade.

**d. The District offered A.K. an IEP for 7th grade that failed to meet his identified needs.**

In anticipation of A.K.'s May 25, 2022 CSE meeting, Parents provided the District with Dr. Marks' December 2021 report and May 6, 2022 update. DE51-77. Based on his testing and observations, Marks made numerous recommendations, including, among other things:

- "An educational setting that [was] smaller and less intimidating (with respect to size of the building itself, frequency/intensity of sensory stimulation, and student-teacher ratio), and perhaps most importantly, nurturing, emotionally supportive, and flexible." DE71.

- "Participation in a social skills group program… to enhance A.K.'s social communication and problem-solving. Particular attention should be paid not only to skill presentation but also opportunities for guided practice and behavioral rehearsal." DE72.

- "[I]ndividual counseling to provide an emotional resource within his academic setting and to provide adaptive coping skills. *Id.*

He added: "[I]t should not be the case that A.K. has to fully unravel academically to qualify for an alternative milieu." DE54.

Mrs. K and Mr. K attended the May 2022 CSE meeting with A.K.'s psychologist, Dr. Jodi Talaferra-Kunz, as well as Dr. Marks. DE4. Consistent with Dr. Marks' recommendations, and in light of A.K.'s ongoing, terrible experience at Salk, they asked for an alternate therapeutic placement for him. T1345:3-6. The CSE declined on the ground that it had to exhaust the continuum of services in the school building before it could recommend an alternate placement. T1344:22-25.

Both Dr. Marks and Dr. Talaferra-Kunz advised the CSE that A.K. would benefit from a smaller, more therapeutic school placement. Dr. Talaferra-Kunz had submitted a letter to the CSE explaining her reasoning. Consistent with Dr. Marks' report, she noted, among other things:

> [A.K.] himself talks about shutting down in class and "not caring" what his teacher thinks, his grades, or what his peers think of him. He has become palpably demoralized about his educational experience which is a stark difference to his feelings last year.
>
> While he has been able to maintain his grades, he is unable to hold himself together emotionally (at least at home or in session) he is clearly emotionally disconnected from school and the effort he is putting into keeping himself "together" in school is taking a toll on his emotional stability.
>
> At this point it is difficult to fathom that his current placement would become successful for him, academically or socially. I think he would be more successful in a smaller setting, with less transitions, small teacher student ratio, and where the

> staff has time built into their schedule to be more flexible and nurturing to his needs. I think the longer he stays in his current environment the more emotional distraught he will become. [52]

Mrs. K recalled Dr. Marks offering an analogy to the May 2022 CSE:

> [H]e made an analogy that really stuck with me. He said, if this were a student that was coming home and cutting himself, we would probably be having a very different conversation. Other than that, everything else was the same, but he said "A" does have emotional scars. We just can't see them. They are there. They are real and he shouldn't have to fall apart for us to make a different recommendation.[53]

The CSE did not adopt the bulk of Dr. Marks or Dr. Talaferra-Kunz's recommendations. It did offer group counseling for 2022-23, despite having told Parents a year earlier that the service was not available at Salk. DE4. Unfortunately, it was Mrs. Williams, with whom A.K. did not have a good rapport, and who had given up on him two months earlier who would now provide both individual *and* group counseling. T1346:13-20. Parents were understandably skeptical that this would be effective.

The CSE also proposed to place A.K. in a 15:1:1 "Special Class," implicitly acknowledging that the larger ICT class in 6th grade had not been appropriate. DE4. But it gave Parents no reason to believe that a numerically smaller class, in itself, would be beneficial to A.K. without a material change to the IEP's programming. Leery that the Special Class would actually represent a step backwards for A.K., Mrs. K asked for a class profile of students in the proposed 15:1:1 class. She wanted to determine whether the other students would be at appropriate academic levels or have problem behaviors. T1363:15-1364:4. The District did not provide the class profile before the 2022-2023 school year. T1364:11-16.

---

[52]PE38-39 (spacing added).
[53] T1348:10-20.

Aside from those changes, the May 2022 IEP closely resembled the April 2021 IEP.[54] As the IHO held, there were no meaningful changes. I-34. And this was a denial of FAPE.

The SRO reversed the IHO's holding. SD-30. As before, he discarded the IHO's express factual finding that A.K. had, in fact, experienced serious emotional distress in 6th grade, declaring that A.K. was not "observed to display any feelings of being distraught." SD29. He added, again rejecting the IHO's finding:

> [T]he CSE also indicated that although it was not minimizing the parents' concerns with regard to the student's emotions and behaviors observed at home, the student did not demonstrate those behaviors and emotions in school and the committee was obligated by regulation to consider and exhaust the district's continuum of services prior to recommending any outside placement.[55]

As noted above, these statements directly conflict not only with Mrs. K's testimony that A.K. was in distress at school, but also with the contemporaneous questionnaire answers, shown above, which show a clear consensus among A.K.'s teachers, based on their direct observation of him – in class, every day – that A.K. was exhibiting signs of serious distress.

The Court should not defer to the SRO's impermissible decision to reject the IHO's credibility determinations and findings of fact.

By offering A.K. effectively the same IEP for 7th grade that had failed him in 6th grade, the District denied A.K. a FAPE. Parents justifiably rejected the IEP and placed A.K. in an appropriate private school.[56]

---

[54] *Compare* DE9-12 (May 2022 IEP) *with* DE28-29 (April 2021 IEP).
[55] SD30.
[56] Parents anticipate that the District will argue that the Vincent Smith School was not an appropriate private placement and reserve any discussion of that issue for their response brief. Similarly, Parents reserve their response to any argument by the District that equitable factors weigh against reimbursement to Parents for tuition at Vincent Smith.

## IV. CONCLUSION

It's not the mid-1960s. Disability rights generally and special education rights specifically are established. Most Americans know what IEPs are. College and professional students request accommodations from well-staffed disability offices. Nevertheless, six decades later, it's still hard to get public schools to take social-emotional disabilities – mental health – as seriously as "academic" learning disabilities and other, more visible types of disability.

A.K. bore the brunt of this disconnect as the District dismissed his anxiety and major depression essentially as passing moods that he could and should just power through at school. If he didn't want to come to counseling – the one IEP service actually intended to address his disabilities – that was on him. What more could the school do?

Unfortunately, the SRO ratified the District's negligence, when, exceeding his authority, he upended the record to declare that A.K. wasn't really that anxious or sad at school – and even if he was, it did not negatively affect his "education."

At the end of *Being Heumann*, Judy Heumann writes:

> Our courts and our judges matter. Our system of justice matters. Civil rights laws are meaningful when people understand the law, advocate for themselves and others, *and* can rely on the justice system to effectively monitor and enforce the law.[57]

A.K.'s social-emotional disabilities were and are real, even if the District chose not to see them, or believe what they saw. The District had a responsibility not just to issue him an appropriately ambitious IEP, but also to commit to it. It did neither. The SRO had an obligation to respect the IHO's credibility and factual findings and apply the law equitably. He did neither. The Court is not required to defer to the SRO where, as here, he improperly modified the record and diluted the IDEA's robust protections for children with all types of disability.

[57] J. Heumann, *Being Heumann*, at 207.

**WHEREFORE,** A.K.'s parents respectfully ask the Court to enforce the IDEA by granting Plaintiffs' Motion for Judgment on the Administrative record, reversing the SRO's poorly reasoned decision and reinstating the IHO's well-reasoned decision.

Dated: December 16, 2025

Respectfully submitted,

Benjamin J. Hinerfeld
**Law Office of Benjamin J. Hinerfeld**
9 Stoddard Street
Plymouth, MA 02360
1528 Walnut Street, Suite 1100
Philadelphia, PA 19102
447 Broadway 2nd Floor
New York, NY 10013
(508) 591-0385
Ben@hinerfeldlaw.com

Richard F. Corrao
**Law Office of Susan J. Deedy & Associates**
1600 Stewart Avenue, Suite 609
Westbury, New York 11590
(516) 221-8133
Rcorrao@Susandeedylaw.com