**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
______________________________________X

**F.K. and P.K.,** individually, and on behalf of their child, A.K., a minor,

Plaintiffs,

-against-

**Levittown Union Free School District,**
Defendant.
______________________________________X

**Case No. 2:25-cv-1495-JMA-AYS**

Individuals with Disabilities Education Act; N.Y. Educ. Law §4401 *et seq*.

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Benjamin J. Hinerfeld
**Law Office of Benjamin J. Hinerfeld**
9 Stoddard Street
Plymouth, MA 02360

1528 Walnut Street, Suite 1100
Philadelphia, PA 19102

447 Broadway 2nd Floor
New York, NY 10013

(508) 591-0385
Ben@hinerfeldlaw.com

Richard F. Corrao
**Law Office of Susan J. Deedy & Associates**
1600 Stewart Avenue, Suite 609
Westbury, New York 11590
(516) 221-8133
Rcorrao@Susandeedylaw.com

**TABLE OF CONTENTS**

**Table of Contents** ........ ii

**Table of Authorities** ........ iii

**I. INTRODUCTION** ........ 1

**II. ARGUMENT** ........ 1

**POINT I** Standard of Review: The Court does not owe deference to the SRO's expertise unless it actually exercises expertise and performs a full and fair review of the record ........ 1

**POINT II** The SRO defined the IDEA's protections too narrowly, disregarding its protections for children whose disabilities extend beyond pure academics ........ 9

**POINT III** The SRO took an imbalanced review of the record, overstating A.K.'s social/emotional/behavioral progress and understating his struggles ........ 11

**POINT IV** The District's Least Restrictive Environment (LRE) argument is misplaced ........ 15

**III. CONCLUSION** ........ 15

## TABLE OF AUTHORITIES

### CASES

*A.M. v. N.Y.C. Dep't of Educ.*,
845 F.3d 523 (2d Cir. 2017) .......... 7

*A.W. v N.Y.C. Dep't of Educ.*,
287 F. Supp. 3d 420 (S.D.N.Y. 2018) .......... 9

*Amanda J. v. Clark Cty. Sch. Dist.*,
267 F.3d 877 (9th Cir. 2001) .......... 6

*Bd. of Educ. v. C.S.*,
90 F.3d 152 (2d Cir. 2021) .......... 6

*Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist. v Rowley,*
458 U.S. 176 (1982) .......... 3, 5

*Breanne C. v. S. York Cnty. Sch. Dist.,*
732 F. Supp. 2d 474 (2010) .......... 10-11

*Carter ex rel. Carter v. Florence Cnty. Sch. Dist. Four*,
950 F.2d 156 (4th Cir. 1991) .......... 16

*C.L. v. N.Y.C. Dep't of Educ.*,
No. 12-1676, 2013 WL 93361 (S.D.N.Y. Jan. 3. 2013) .......... 7

*C.L. v. Scarsdale Union Free Sch. Dist.*,
744 F.3d 826 (2d Cir. 2014) .......... 7

*Elena M. v. Sch. Dist. of Phila.*,
No. 22-4726, 2025 WL 968310 (E.D. Pa. Mar. 31, 2025) .......... 10-11

*F.O. v. New York City Department of Education*,
976 F. Supp. 2d 499 (S.D.N.Y. 2013) .......... 8

*Gagliardo v. Arlington Cent. Sch. Dist.,*
489 F.3d 105 (2d Cir. 2007) .......... 5

*Karl by Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist.*
736 F.2d 873 (2d Cir. 1984) .......... 3-4

*K.R. v. N.Y.C. Dep't of Educ.*,
107 F. Supp. 3d 295 (S.D.N.Y. 2015) .......... 6, 9

*L.O. v. N.Y.C. Dep't of Educ.*,
822 F.3d 95 (2d Cir. 2016) .......... 7

*L.R. v. N.Y.C. Dep't of Educ.*,
193 F. Supp. 3d 209 (2016) .......... 9

*M.C. v. Cent. Reg'l Sch. Dist.*,
81 F.3d 389 (3d Cir.1996) .......... 10

*M.H. v. N.Y.C. Dep't of Educ.*,
685 F.3d 217 (2d Cir. 2012) .......... *passim*

*Mavis ex rel. Mavis v. Sobol,*
839 F. Supp. 968 (N.D.N.Y. 1993) .......... 4

*Mobley v. Lab. Charter Sch.*,
No. 24-2267, 2025 WL 2621303 (E.D. Pa. Sep. 11, 2025) .......... 11

*R.E. v. N.Y.C. Dep't of Educ.,*
694 F.3d 167 (2d Cir. 2012) .......... *passim*

*Rowley v. Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist.*,
632 F.2d 945 (2d Cir. 1980) .......... 3

*Town of Burlington v. Dep't of Educ.,*
736 F.2d 773 (1st Cir. 1984) .......... 4

*W.S. v. Rye City Sch. Dist.*,
454 F. Supp. 2d 134 (S.D.N.Y. 2006) .......... 8

*Walczak v. Fla. Union Free Sch. Dist.*,
142 F.3d 119 (2d Cir. 1998) .......... 5

*Zayas v. Banks*,
2025 WL 1091225 (2d Cir. Apr. 8, 2025) .......... 2

**STATE REVIEW OFFICER DECISIONS**

*In Application of the Board of Education of the Syosset Central School District,*
SRO No. 18-062, https://www.sro.nysed.gov/decision/2018/18-062 .......... 10-11

**STATUTES AND RULES**

20 U.S.C. § 1400, *et seq*. (Individuals with Disabilities Education Act) .......... *passim*

20 U.S.C. § 1415(i) .......... 2

**OTHER REFERENCES**

https://www.pearsonassessments.com/en-us/Store/Professional-Assessments/Behavior/Behavior-Assessment-System-for-Children-%7C-Third-Edition-/p/100001402?tab=product-details .......... 13

## I. INTRODUCTION

The District, like the SRO, does not grapple with A.K.'s lived experience. Both impermissibly narrow what it means to provide FAPE---focusing solely on grades at the expense of everything else we know schooling encapsulates. For fifth grade, it reduces a year of social, emotional and academic turmoil into one clause: "Due to A.K.'s progress within the ICT program…"[1] But that years' worth of turmoil and regression gave the district a duty to change his program for sixth grade (2021-2022). Yet, as it concedes, it didn't make any meaningful changes.[2] For sixth grade, the District, like the SRO, minimizes A.K.'s social/emotional/behavioral struggles, noting only that "his daily living skills were appropriate; and that he achieved moderately elevated scores on the anxiety, depression and anger scales."[3]

The District hangs it hat on whether the SRO did a thorough and complete analysis. But as explained below, the SRO's definition of FAPE was too narrow, and its review of the record fatally flawed. The Court should reject the SRO's flawed logic and imbalanced factual findings.

## II. ARGUMENT[4]

### POINT I

**Standard of Review: The Court does not owe deference to the SRO's expertise unless it actually exercises expertise and performs a full and fair review of the record.**

The District argues that the Court "must" defer to the SRO unless its decision is "inadequately reasoned."[5] It does not offer much additional guidance about what constitutes an inadequately or well-reasoned decision, however. As explained below, the Court owes deference

[1] Def. Br. at 3 (quoting *Zayas v. Banks*, 2025 WL 1091225, *3 (2d Cir. Apr. 8, 2025).
[2] *Id.* (noting that the District continued to offer ICT classes)
[3] Def. Br. at 13 (citing DE16).
[4] Because the parties' cross-motions cover largely the same ground, Plaintiffs will refer here to several points made in their opening memorandum. Mem. of Law in Support of Plaintiffs' Mot. for Judgment on the Adm. Record (PLMOL). This response largely addresses points not addressed in Plaintiffs' opening brief.
[5] Def. Br. at 5.

to the SRO's expertise only when it actually exercises expertise and performs a fair review of the record.

Federal courts have shown flexibility in setting the parameters of their review of the SRO, guided by common sense. Starting with the text of the IDEA, there is no such limit on the scope review of an IHO/SRO decision:

> In any action brought under this paragraph, the court--
> **(i)** shall receive the records of the administrative proceedings;
> **(ii)** shall hear additional evidence at the request of a party; and
> **(iii)** basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.[6]

In its seminal *Rowley* decision, however, the Supreme Court's majority imposed a limit on the court's scope of judicial review not found in the statute:

> [T]he provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought.[7]

Justice White, joined by Justices Brennan and Marshall, dissented:

> The majority does acknowledge that the current language… was substituted at Conference for language that would have restricted the role of the reviewing court much more sharply***. It is clear enough to me that Congress decided to reduce substantially judicial deference to state administrative decisions. The legislative history shows that judicial review is not limited to procedural matters and that the state educational agencies are given first, but not final, responsibility for the content of a handicapped child's education***.[8]

---

[6] 20 U.S.C. § 1415(i)(2).
[7] *Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist. v Rowley,* 458 U.S. 176, 206 (1982). Rowley was the first Supreme Court decision interpreting the IDEA. It reversed a decision of the Second Circuit. *Rowley v. Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist*., 632 F.2d 945, 946 (2d Cir. 1980).
[8] *Id*. at 216-17 (White, J., dissenting) (emphasis added)

Shortly after *Rowley*, a divided Second Circuit panel wrote a direct, devastating summary of the Supreme Court's new standard of review: "We are explicitly cautioned not to impose a particular substantive educational standard on the state or to require equality of opportunity for the handicapped in education."[9]

Judges immediately pushed back, and rightfully so. The dissent in *Karl*, focusing on the IDEA's text, admonished the majority that it had abandoned its role to protect children with disabilities with its rigid application of *Rowley's* "due weight" standard:

> The majority today has turned its back on Congress's direction that a district court should actively review the [IEP] of an aggrieved handicapped child, and it has precluded any realistic judicial review of state administrative decisions under the [IDEA]….
>
> Congress's intense concern for the welfare of each handicapped child was demonstrated by the type of judicial review it commanded. It rejected the conventional form wherein an administrator's decision must be sustained if supported by substantial evidence. Instead, Congress commanded the courts to conduct *de novo* hearings which would consider both the administrative record and any additional evidence offered by a party, and to reach decisions based on a preponderance of the evidence….
>
> *Rowley's* "gloss" on a clearly written statute requires only that the district judge give "due weight" to the views of the administrators; when those views conflict, it does not require him to accept the conclusion of the state's commissioner of education, nor does it relieve him of the burden of making the *de novo* determination required by Congress.
>
> In ratifying the commissioner's decision, the majority has, in effect, adopted the substantial evidence standard of review that Congress carefully rejected. Indeed, by semantically shifting *Rowley's* substantively oriented "reasonably calculated" standard to a procedural inquiry of whether the determination was a "reasoned calculation", the majority has effectively eliminated the substantive step of the *Rowley* analysis.[10]

---

[9] in *Karl by Karl v. Board of Education of Geneseo Central School District*, 736 F.2d 873, 876 (2d Cir. 1984).
[10] *Id.* at 878-79 (Pratt, J. dissenting).

And since *Karl*, courts in the Second Circuit have given various formulations for deference to the SRO. For example, in *Mavis ex rel. Mavis v. Sobol*,[11] the district court, reversing the SRO and noting that Second Circuit caselaw since *Karl* was "not particularly enlightening,"[12] followed the First Circuit, which required detailed, substantive engagement with the SRO:

> The traditional test of findings being binding on the court ***if supported by substantial evidence, or even a preponderance of the evidence, does not apply***. This does not mean, however, that the findings can be ignored. The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. ***After such consideration, the court is free to accept or reject the findings in part or in whole***.[13]

In *Gagliardo v. Arlington Central School District*, [14] the Second Circuit held that courts must be mindful that the judiciary generally "lack[s] the specialized knowledge and experience necessary to resolve ***persistent and difficult questions of educational policy***." [15] Still, it reiterated that, while courts should not "impermissibly meddle in state educational methodology…. they must examine the record for 'objective evidence' that indicates 'whether the child is likely to make progress or regress under the proposed plan.'"[16]

A few years later, in *M.H. v. New York City Department of Education*,[17] the court changed its language subtly, saying that a review "is by no means an invitation to the courts to substitute

[11] 839 F. Supp. 968, 986-87 (N.D.N.Y. 1993)
[12] *Id.* at 987.
[13] *Id.* at 986-87 (emphasis added) (quoting *Town of Burlington v. Dep't of Educ*., 736 F.2d 773, 792 (1st Cir. 1984)).
[14] *Gagliardo v. Arlington Cent. Sch. Dist*., 489 F.3d 105, 113 (2d Cir. 2007) (emphasis added) (quoting *Rowley*, 458 U.S. at 206, 208). The Court asked the parties to address this point in its October 9, 2025 pre-motion conference: "In light of my reading of these two opinions, why, and this is an argument for the Plaintiffs, would I not exercise deference to the opinion of the SRO where the SRO's decision is high quality, well-reasoned and thorough. Because it is not my position as an appellate body, so to speak, to second guess the policy issues at play in a case like this." T4:14-19. The Court added: "So, why I ask both parties to address, you know, as a Federal Court, sitting as an appellate body that has been instructed by the Second Circuit not to second guess the policy issues here, it seems to me that there's sort of a policy dispute between the SRO and the IHO, and that is not where this court need to go." T14:17-22.
[15] Plaintiffs doubt that the Court here needs to weigh in on any ***persistent and difficult questions of educational policy***—this appeal is a matter of assessing whether facts in the record support the parties' claims and weighing the relative merits of legal arguments – well within any court's capabilities and in-line with Congress's original mandate.
[16] *Gagliardo*, 489 F.3d at 113 (quoting *Walczak v. Fla. Union Free Sch. Dist*., 142 F.3d 119, 130 (2d Cir. 1998)).
[17] 685 F.3d 217, 244 (2d Cir. 2012).

***their own notions of sound educational policy for those of the school authorities which they review***."[18] It then acknowledged that deference "is complicated… by the fact that it occurs in the context of a complex statutory scheme involving institutional actors at different levels and within different branches of state and federal government."[19] And it stated:

> [T]he district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example ***whether the decision being reviewed is well-reasoned***, and whether it was ***based on substantially greater familiarity with the evidence and the witnesses than the reviewing cour***t.[20]

The *M.H.* court then gave more examples:

- [D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures.
- Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress.
- Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not.
- [T]he district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency.[21]

Subsequently, the Second Circuit and district courts have provided more examples of when deference does and does not apply:

- *Little deference* when the SRO interprets objective indications of progress,[22] or upsets the IHO's findings by citing documents that lack foundation or testimonial corroboration.[23]

---

[18] *M.H.,* 685 F.3d at 240 (emphasis added) (quoting *Rowley*, 458 U.S. at 206).
[19] *Id*. at 244.
[20] *Id*. (Emphasis added).
[21] *Id.* (bullets and spacing added).
[22] *Id.* at 244.
[23] *K.R. v. N.Y.C. Dep't of Educ*., 107 F. Supp. 3d 295, 308 (S.D.N.Y. 2015).

- *No deference* to the SRO's legal conclusions, which are reviewed wholly *de novo*.[24]

- *No deference* when the SRO disregards the IHO's credibility assessments without explanation.[25]

- *No deference* when the SRO fails "to grapple with" evidence contrary to its own findings of fact.[26]

- *No deference* when the SRO's conclusions are not "grounded in a thorough and careful analysis" or are "not supported by a preponderance of the objective evidence."[27]

The upshot is that the Second Circuit and districts courts *do* get into the proverbial weeds to reverse the SRO, not only when its reasoning is unsound, but also when its factual conclusions lack support. Where, as here, an SRO chooses to ignore important and contradictory evidence, courts have not deferred to that choice as "state policy" or "institutional expertise." Instead, they acknowledge that the SRO's review was not thorough.

And where the SRO purports to give different weight to evidence than the IHO, courts insist that it actually weighed the evidence and explained its reasoning. For example, in *A.M. v. New York City Board of Education*,[28] the Second Circuit reversed the SRO when it improperly disregarded evidence of the child's needs:

> [W]here, as here, 'it appears plain that, contrary to the findings of the SRO,' the placement was "not adequately designed to address and improve" the child's educational needs, the administrative officer's analysis is deserving of no deference….[29]

It then delved into the record, considering evidence about the child that the SRO disregarded. It credited a private report, ignored by the SRO, that recommended a program that

---

[24] *Bd. of Educ. v. C.S.*, 990 F.3d 152, 165 (2d Cir. 2021).
[25] *Amanda J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 888 (9th Cir. 2001).
[26] *C.L. v. N.Y.C. Dep't of Educ*, No. 12-1676, 2013 WL 93361, *7 (S.D.N.Y. Jan 3, 2013).
[27] *M.H.*, 685 F.3d at 248.
[28] 845 F.3d 523 (2d Cir. 2017).
[29] *Id.* at 543 (quoting *L.O. v. N.Y.C. Dep't of Educ*., 822 F.3d 95, 117 (2d Cir. 2016)).

the CSE had omitted.[30] It credited a pediatric neurology evaluation, which recommended applied behavior analysis (ABA).[31] It credited another physician who also recommended ABA. Ultimately, it found evidence of a "clear consensus" about the child's needs,[32] and that the SRO was not free to disregard that evidence.[33] The court thus overruled the SRO even where he ostensibly invoked institutional expertise about a challenged substantive program.

In *M.H.*, the district court and Second Circuit both held that the IHO's analysis was more persuasive than the SRO's. The student's IEP did not provide a program that would meet the child's needs.[34] The Second Circuit noted in affirming the district court: "in reviewing the SRO's decision, the court often relied on the carefully articulated contrary observations, insights, and conclusions of the IHO. We think that to have been entirely proper."[35] The court also agreed with the district court's analysis that the IEP's goals were – contrary to the SRO's finding – "wanting."[36]

Similarly, in *F.O. v. New York City Department of Education*,[37] the SRO "utterly failed to meet the Second Circuit's standard" by ignoring a credible expert and failing to analyze conflicting evidence of the parents' witnesses.[38] The court wrote: "It is difficult to imagine how failing to address conflicting evidence could produce a 'well-reasoned' decision."[39] The court also rejected the argument that it had to defer categorically to the SRO's re-weighing of evidence:

> The DOE contends that "this sort of weighing of conflicting evidence is exactly the sort of area in which judges are required to defer to the SRO." However, ***the SRO must actually weigh conflicting evidence before the Court defers to the SRO for weighing conflicting evidence***; it is difficult to characterize the SRO's stubborn reliance on the DOE's witnesses, and failure to account for other witnesses'

[30] *Id.* at 543-44.
[31] *Id.* at 544.
[32] *Id.* at 545.
[33] *Id.*
[34] 685 F.3d at 233.
[35] *Id.* at 246.
[36] *Id.* at 247 (internal citations to the *M.H.* district court's opinion omitted).
[37] *F.O.*, 976 F. Supp. 2d 499 (S.D.N.Y. 2013)
[38] *Id.* at 514.
[39] *Id.* at 514.

conflicting testimony, as "weighing" anything. "[T]he SRO's decision reveals that, far from merely weighing evidence differently, the SRO failed to distinguish, explain, or otherwise analyze certain conflicting evidence in his analysis."[40]

In *R.E. v. New York City Department of Education*,[41] the Second Circuit reversed the SRO for a finding that was "against the overwhelming weight of the evidence."[42] It credited the IHO, which found an evidentiary consensus that the student needed a high level of support. The *R.E.* court then explained why the SRO was wrong to reverse the IHO:

> [T]he majority of the reports recommended 1:1 instruction. Even those reports that did not specifically recommend a 1:1 ratio emphasized that R.K. needed a high level of support. Further, almost all of the reports found that R.K. needed continued ABA therapy. The fact that some reports did not mention a specific teaching methodology does not negate the clear consensus that R.K. required ABA support. However, the plan proposed in her IEP offered her a 6:1:1 classroom with no dedicated aide and no guarantee of ABA therapy or any meaningful 1:1 support. ***Because the SRO's conclusion was against the weight of the evidence and thus flawed, deference to it is not warranted***.[43]

In *L.R. v. New York City Department of Education*,[44] the court reversed the SRO for, in effect, giving reasons that weren't reasons:

> In finding the 15:1 placement appropriate, the SRO relied on the following testimony …: "We felt that L.R. would benefit from being in a self-contained class with 15 students and a teacher for him academically within a community school……" But it is circular to attempt to demonstrate that a class is the least restrictive environment with sufficient support by merely stating that it is so. A more detailed explanation of what justified the 15:1 placement—with specific reference to L.R.'s circumstances—should have been provided to demonstrate the IEP was "reasonably calculated" to provide benefits based on L.R.'s "unique needs." In fact, nowhere in the SRO's discussion of the 15:1 class placement does the SRO consider evidence or testimony that explains, with specifics to L.R., ***why a 15:1 class was appropriate.***[45]

---

[40] *Id.* at 514 n.9 (cleaned up) (quoting *W.S. v. Rye City Sch. Dist*., 454 F. Supp. 2d 134, 145 (S.D.N.Y. 2006)); *M.H.*, 712 F. Supp. 2d at 166 n.18.).
[41] 694 F.3d 167 (2d Cir. 2012).
[42] *Id.* at 194.
[43] *Id.* (Emphasis added).
[44] 193 F. Supp. 3d 209 (2016).
[45] *Id.* at 215.

In *A.W. v New York City Department of Education*,[46] the court reversed the SRO for relying on one witness while ignoring contrary evidence from other witnesses, and for illogically stating that the student's ability to focus in a 9:1:1 class meant that he could also benefit from a class of thirty students.[47]

In *K.R.*, the court reversed the SRO for relying on cold CSE meeting minutes to overrule the IHO and find that parents had been given fair opportunity to participate, despite there being no testimony to show that the CSE minutes were reliable.[48]

All of these cases show that the proper analysis ***is to examine each case carefully and not to give the SRO institutional or expert deference unless it demonstrably earns it.*** As explained below, the SRO's analysis reversing the IHO suffers from many of the same flaws to which these cases called attention.

**Point II**

**The SRO defined the IDEA's protections too narrowly, disregarding its protections for children whose disabilities extend beyond pure academics.**

The SRO's reversal of the IHO required him to take an impermissibly narrow view of the IDEA's protections. And like the SRO, the District limits the measure of A.K.'s progress to traditional academic subjects, ignoring his severe social, emotional and behavioral regression. As explained in Parents' opening memorandum,[49] Congress did not confine itself to traditional academics in enacting the IDEA. For A.K., FAPE requires an IEP that addresses both his academic *and* non-academic needs with robust, individualized interventions.[50] "A school district denies a

[46] 287 F. Supp. 3d 420 (S.D.N.Y. 2018).
[47] *Id.* at 434-35.
[48] 107 F. Supp. 3d at 308.
[49] PLMOL at 3-6. 20-22.
[50] *See Breanne C. v. S. York Cnty. Sch. Dist.*, 732 F. Supp. 2d 474, 483 (2010) ("An IEP confers a meaningful educational benefit when it is … designed to offer the child the opportunity to make progress ***in all relevant domains under the IDEA, including behavioral, social and emotional.***") (Emphasis added) (citing *M.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 394 (3d Cir.1996) (finding denial of FAPE where IEP contained no strategies to reduce child's

student a FAPE if it fails to address the student's 'behavioral problems in a systematic and consistent way.'"[51]

For example, in *Mobley v. Laboratory Charter School*,[52] the court reaffirmed that social, emotional and behavioral challenges are not secondary to academic:

> [T]he Hearing Officer correctly observed that the draft IEPs are generic and "not individualized or tailored to the Student's emotional, behavioral, academic, or social disability-related needs or circumstances." Because a review of the draft IEPs does not glean anything different, the Court will affirm the Hearing Offer's finding that both IEPs drafted by Lab Charter for I.W.M. fell short of the IDEA's requirements.

Similarly, in *Elena M.*, the court, reversing the hearing officer's decision, held that the district denied the child a FAPE where it failed to provide adequate behavioral programming and failed to monitor the child's behaviors adequately.[53]

The New York SRO agrees. In *Application of the Board of Education of the Syosset Central School District*, the child was denied a FAPE due to the district's failure to address his serious social, emotional, and behavioral needs.[54] Although the student there, much like A.K., had grade level abilities, he had serious social, emotional, behavioral, and attention-based struggles.[55] The IHO, like the IHO here, rejected the district's excuse that the "the student's emotional issues were only 'family problems' and found that they were caused by his 'school performance stressors as well as family issues.'"[56] He affirmed the IHO's finding that the district denied the student a FAPE.

---

behaviors)); *Elena M. v. Sch. Dist. of Phila.*, 2025 WL 968310, *10 (E.D. Pa. Mar. 31, 2025) ("An IEP provides meaningful educational benefits when it offers the student an opportunity to make behavioral, social, and emotional progress.") (Citing *Breanne C.*, 732 F. Supp. 2d at 483).

[51] *Elena M.*, 2025 WL 968310, at *11 (quoting *Colonial Sch. Dist. v. N.S.*, No. 19-1311, 2020 WL 1517562, *14 (E.D. Pa. Mar. 30, 2020)).

[52] No. 24-2267, 2025 WL 2621303, *19-20 (E.D. Pa. Sep. 11, 2025).

[53] 2025 WL 968310, at *14

[54] SRO No. 18-062, https://www.sro.nysed.gov/decision/2018/18-062 (visited Jan. 29, 2026).

[55] *Id.* at 16-17.

[56] *Id.* at 7.

And in facts that closely resemble this case, he cited contemporaneous teacher questionnaire results that refuted the district's effort to minimize the student's distress *in school*:

> [C]ontrary to the school psychologist's testimony, it appears that the student's teachers reported greater concern for the student…. [S]everal of the student's teachers rated the student's social/emotional functioning in the very elevated range on scales that measured inattention, hyperactivity/impulsivity, and defiance/aggression, and in the elevated range on scales related to learning problems/executive functioning.[57]

Ultimately, the SRO agreed with the IHO that the CSE's failure to offer robust, individualized social, emotional and behavioral supports was a denial of FAPE.[58]

Here, the SRO focused almost exclusively on A.K.'s supposed academic success, finding that, to the degree he had social/emotional/behavioral problems, they did not materially affect his education. But the IDEA's protections for a child's non-academic disabilities are not merely derivative of or subordinate to the child's academic disabilities. As explained in Parents' opening memorandum, the Court should reject this narrow interpretation of the IDEA's protections. [59]

**Point III**

**The SRO took an imbalanced review of the record, overstating A.K.'s social/emotional/behavioral progress and understating his struggles.**

The SRO took an imbalanced review of the record, highlighting evidence suggesting that A.K. made social/emotional/behavioral progress, while minimizing or wholly ignoring clearer evidence that he struggled and regressed. For example, he did a selective review of behavior ratings scales (like the ones mentioned in SRO 18-062, above) completed by A.K.'s teachers.

Discussing the April 2021 IEP's Evaluation/Reports section, he cited a *2019* psychological evaluation that included results from the Conners-3 questionnaire, "an assessment utilized to

---

[57] *Id.* at 19.
[58] *Id.* at 21.
[59] *See* PLMOL at 5-6, 7-10, 14, 28.

obtain social/emotional functioning across both the home and school settings."[60] Without explanation, he highlighted the 2019 observation that "parent responses yielded significantly higher scores in the areas of inattention, hyperactivity/impulsivity, and peer relations, while the teacher responses yielded significantly higher scores in defiance/ aggression."[61] His reference to the parent/teacher ratings discrepancy implicitly supports the false conclusion that A.K.'s social/emotional/behavioral difficulties were primarily at home, not at school.

Then, in discussing A.K.'s the 2021-2022 school year, the SRO conspicuously ignored questionnaires showing how A.K. struggled that year. In Spring 2022, four teachers completed questionnaires for the nationally normed Behavior Assessment for Children-Third Edition (BASC-3). Their contemporaneous answers – given well before the District put together its coordinated litigation narrative – contradict any claim that A.K. was not displaying noticeable unhappiness or struggles in school.[62] The BASC-3 table in Dr. Marks's evaluation report is broken into 20 separate sub-categories/composites, reporting answers from each teacher.[63] Combined, the four teachers – based on their observations of A.K.'s behaviors in their class – identified A.K. as *At-Risk* or *Clinically Significant* in 35 of 80 possible sub-categories/composites. Dr. Marks interpreted the responses as follows in his report:

> Although somewhat varied across respondents, ratings obtained from A.K.'s teachers indicated significant internalizing symptoms (Anxiety, Depression, Withdrawal) along with weaknesses in Adaptive Skills (Adaptability, Social Skills, Leadership, Activities of Daily Living, Functional Communication) and compromised Peer Relations.[64]

---

[60] S-15 (citing DE96-99 – "2019 Confidential Psychological Report")
[61] S-15.
[62] PLMOL at 20-22 (citing DE62-63, 67-68).
[63] PLMOL at 20 (reproducing tables from DE67-68). Like other questionnaires, the answers are gleaned from teachers responses to questions carefully designed to yield accurate responses based on their observations, not from teachers expressing their subjective opinions about the child's functioning. *See, e.g.,* https://www.pearsonassessments.com/en-us/Store/Professional-Assessments/Behavior/Behavior-Assessment-System-for-Children-%7C-Third-Edition-/p/100001402?tab=product-details (visited Jan. 29, 2026).
[64] DE71.

And at trial, in testimony ignored by the SRO, Dr. Marks discussed variability and consistency between parent and teacher ratings:

> At the school, again, taking into account some variability between reporters, but again, many of those themes that were identified on parent reports, in other words anxiety, depression, withdrawal, those were rated as significant concerns by personnel at school at that time.
>
> And there were also reports… by some of the instructors, again, somewhat varyingly of poor social skills, issues around leadership, functional communication. Those signals were more mixed. But certainly he was very much reported to show high levels of internalizing problems or anxiety and depression.
>
> So that's notable in that, you know, internalizing problems are characterized as such because they are often more inward or privately manifest, but we have, essentially, a full roster of individuals both at home and at school that are keenly aware of and observing expressions of anxiety and depression which really form the basis for the internalizing problems in A.K.
>
> So, in other words, it was very apparent to others at the time that he was substantially anxious and substantially upset or unhappy at that time. The reports from the teachers on the other hand contrast to the parent reports did not indicate significant inattention, hyperactivity or impulsivity but there was uniform consensus that he was struggling socially, that his peer relationships were an area of substantial concern.[65]

Despite having just cited 2019 ratings scales to defend a 2021 IEP,[66] the SRO ignored A.K.'s alarming Spring 2022 BASC scores when discussing A.K.'s progress in 2022. Discussing Dr. Marks' report and his participation at the May 2022 CSE meeting, the SRO quoted the District's self-serving, post-meeting summary, which disregards its own teachers' BASC-3 results.[67] He quoted the District's own gloss on Mark's report that "the student experienced many meltdowns at home regarding school."[68] Discussing A.K.'s 2021-2022 experience, he cited one sentence from a subjectively written progress report: "A.K. continues to struggle to see the influence his negative

[65] T713:23-
[66] S-15.
[67] S-26 (citing DE15-16).
[68] S-26 (citing

self-concept and negative beliefs regarding middle school has on his actual experiences in the school setting. Since March, there has been an increase in his resistance to attending counseling sessions."[69]

Ultimately, when the SRO summarized A.K.'s experience in 2021-2022 he wrote, contrary to plain evidence provided by the District's witnesses' recorded observations: "[D]espite the frustration the student expressed to the parent at home, documentary evidence shows the student accessed the general education curriculum with the academic and emotional supports provided by the district in accordance with the April 2021 IEP and made meaningful progress."[70]

Yet the "documentary evidence" he cited excluded and failed to reconcile clear, contemporaneous observations of A.K.'s struggles. In an impartial, complete, objective review of the record, there was no excuse for the SRO to disregard clear evidence of A.K.'s struggles, as it did here. The Court should require the SRO to conduct a review of all of the evidence, not to omit evidence that contradicts its analysis.

**Point IV**

**The District's Least Restrictive Environment argument (LRE) is misplaced.**

When a child needs more intensive services than a mainstream classroom can offer, a school can recommend a more restrictive placement. Here, for 2022-2023, Parents' experts recommended a small, nurturing, emotionally supportive, flexible, therapeutic placement.[71] The IHO implicitly credited their opinions. The District's proposed classroom may have been less restrictive than what Parents sought, but it was not appropriate to meet A.K.'s needs. As the Second Circuit explained: "[T]he IDEA's LRE requirement 'was aimed at preventing schools from

---

[69] S-21 (citing DE131).
[70] S-20.
[71] DE71 (Marks report); PE38-39 (Tafarelle-Kunz letter).

segregating [disabled] students from the general student body,' but not necessarily 'to restrict parental options when the public schools fail to comply with the requirements of the [IDEA]."[72]

In sum, if the Court agrees with the IHO that the District failed to offer A.K. an IEP reasonably calculated for him to make progress appropriate in light of his circumstances, then it should find that Parents were justified in rejecting that program regardless of its level of restrictiveness.

## III. CONCLUSION

**WHEREFORE,** for the reasons stated in this memorandum and in their opening memorandum, A.K.'s parents respectfully ask the Court to enforce the IDEA by denying Defendant's Motion for Judgment on the Administrative Record, granting Plaintiffs' Motion for Judgment on the Administrative Record, reversing the SRO's poorly reasoned decision, and reinstating the IHO's well-reasoned decision in A.K.'s favor.

Dated: January 30, 2026

Respectfully submitted,

Richard F. Corrao
**Law Office of Susan J. Deedy & Associates**
1600 Stewart Avenue, Suite 609
Westbury, New York 11590
(516) 221-8133
Rcorrao@Susandeedylaw.com

Benjamin J. Hinerfeld
**Law Office of Benjamin J. Hinerfeld**
9 Stoddard Street
Plymouth, MA 02360
1528 Walnut Street, Suite 1100
Philadelphia, PA 19102
447 Broadway 2nd Floor
New York, NY 10013
(508) 591-0385
Ben@hinerfeldlaw.com

[72] *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826 (2d Cir. 2014) (citing *Carter ex rel. Carter v. Florence Cnty. Sch. Dist. Four*, 950 F.2d 156, 160 (4th Cir. 1991) (citing H.R. Rep. No. 94-332 (1975)), aff'd, 510 U.S. 7 (1993)).