UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X

F.K. and P.K., individually, and on behalf of their
Child, A.K., a minor,

        Plaintiffs,

    -against-

LEVITTOWN UNION FREE SCHOOL DISTRICT,

        Defendant.

------------------------------------------------------------------------ X

Civil Action No. 2:25-cv-01495
(JMA)(AYS)

**DEFENDANT'S MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFFS' CROSS MOTION FOR JUDGEMENT ON THE ADMINISTRATIVE RECORD**

**KEANE & BEANE, P.C.**

Attorneys for Defendant

445 HAMILTON AVENUE, 15TH FLOOR

WHITE PLAINS, NEW YORK 10601

(914) 946-4777

*9005/402/4919-8591-0408v2  1/30/26*

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................................ 1

II.   ARGUMENT ........................................................................................................ 2

    A.    The SRO properly considered A.K.'s social-emotional and academic progress in fifth grade ................................................................................. 2

    B.    The District offered A.K. a free and appropriate public education in sixth grade ............................................................. 8

    C.    A.K. made meaningful progress in sixth grade ................................................................................. 10

    D.    The District offered A.K. a free and appropriate public education in seventh grade ................................................................................. 13

III.  CONCLUSION ..................................................................................................... 16

*9005/402/4919-8591-0408v2  1/30/26*

## TABLE OF AUTHORITIES

Page(s)

Cases

*Carlisle Area Sch. v. Scott P.*,
   62 F.3d 520 (3d Cir. 1995) .................................................................................... 15

*Endrew F. v. Douglas Cty. Sch. Dist. RE-1*,
   580 U.S. 386 (2017) ................................................................................. 6, 7, 8, 16

*M.W. ex rel. S.W. v. New York City Dep't of Educ.*,
   725 F.3d 131 (2d Cir. 2013) ............................................................................ 15, 16

*Newington Bd. of Educ.*,
   546 F.3d 111 (2d Cir. 2008) ............................................................................ 15, 16

*Robert Walczak, et al. v. Florida Union Free School District, et al.*,
   142 F.3d at 130 ...................................................................................................... 15

Statutes

20 U.S.C. §1412(a)(5)(A) ............................................................................................. 14

20 U.S.C. §1414(d)(1)(A)(i)(IV)(bb) ............................................................................ 16

Regulations

8 NYCRR 200.6(a)(1) .................................................................................................... 14

34 C.F.R. 300.114(a)(2)(i), 300.116(a)(2) .................................................................... 14

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------- X

F.K. and P.K., individually, and on behalf of their
Child, A.K., a minor,

              Plaintiffs,

       -against-

LEVITTOWN UNION FREE SCHOOL DISTRICT,

             Defendant.

-------------------------------------------------------------------------- X

Civil Action No. 2:25-cv-01495
(JMA)(AYS)

## MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFFS' CROSS-MOTION FOR JUDGEMENT ON THE ADMINISTRATIVE RECORD

## I.     PRELIMINARY STATEMENT

This Memorandum of Law is submitted on behalf of the Levittown Union Free School District (the "District") in response to Plaintiffs' Cross-Motion for Judgment on the Administrative Record ("Plaintiffs' Cross-Motion"). In its own Cross-Motion for Judgement on the Administrative Record ("District's Cross-Motion"), supported by a Declaration of Susan E. Fine, Esq., and a Memorandum of Law, each dated December 16, 2025, the District moves this Court to deny Plaintiffs' Cross-Motion and uphold the decision of the New York State Review Officer ("SRO"), dated November 20, 2024, in Decision Number 24-381 (the "SRO Decision").

In its Memorandum of Law in support of its Cross-Motion, Plaintiffs make various arguments as to why the SRO Decision should be overturned by this Court. Upon examination of Plaintiffs' arguments, it is clear that Plaintiffs cannot meet the threshold set by this Court to overcome the deference standard due to the final decision of the SRO. To be sure, the Plaintiffs have failed to convincingly argue that the SRO decision was inadequately reasoned or lacked the careful analysis or thoroughness required by this Court.

9005/402/4919-8591-0408v2  1/30/26

For the reasons set forth below, the District maintains that the SRO did consider each of the arguments Plaintiffs claim he ignored or failed to consider. In fact the SRO gave due consideration to the entirety of the Record and came to a determination in favor of the District. The SRO's decision is detailed, reasoned and supported by legal authority. Accordingly, the District submits that this Court should not substitute its judgment over that of the SRO and that the District's Cross-Motion should be granted in full and Plaintiffs' Cross-Motion should be denied.

## II.    ARGUMENT

The District respectfully refers the Court to its Memorandum of Law in Support of its Cross-Motion, dated December 16, 2025, for the District's arguments supporting a judgment in its favor. In this Memorandum of Law, the District addresses the arguments presented by Plaintiffs in its Cross-Motion.  The District submits that the examination of Plaintiffs' position demonstrates that they cannot be successful in its Cross-Motion.

### A.    The SRO properly considered A.K.'s social-emotional and academic progress in fifth grade.

Plaintiffs argue that the SRO did not properly consider A.K.'s social and emotional needs and progress in his fifth-grade year.[1] Nothing could be further from the truth. The SRO specifically, and exhaustively, reviewed A.K.'s functioning – both academically and emotionally – during his

---

[1] It should be noted that the Student's fifth-grade year is not a year in controversy in this matter, rather Plaintiffs' Request for Due Process claimed alleged deficiencies in recommendations for an appropriate program for his sixth and seventh grade years.

fifth-grade year.  (SD 10-SD 18)[2]. Initially, the SRO noted that Plaintiffs did not properly put the question as to whether the Committee on Special Education ("CSE") convened in the spring of A.K.'s fifth-grade year properly identified his present levels of performance. The SRO found that:

> The parent did contest the student's present levels of performance in the due process complaint notice (see Parent Ex. A at p. 5). However, the IHO did not find that the student's present levels of performance were inaccurate, and the parent did not appeal that lack of finding by the IHO. As such, I will refer to the student's IEPs as necessary when discussing the student's then-current needs.

(SD 10). Accordingly, the SRO's reliance on the CSE documents, such as the IEP and the Prior Written Notice ("PWN") was appropriate, as Plaintiffs waived their opportunity to contest the SRO's failure to find that the present levels of performance at the end of the Student's fifth-grade year were not accurate. Despite this, Plaintiffs now attempt to revisit whether the SRO properly examined his present levels of performance after his fifth-grade year.

A review of the administrative record fully supports the SRO's findings of fact regarding A.K.'s progress during fifth grade. In terms of A.K.'s social and emotional functioning, the District disputes Plaintiffs' claims that the Student "regressed" in fifth grade. When A.K. commenced fifth grade, he was not only transitioning from elementary school to middle school, he was also transitioning back to school after the months' long school closure due to the COVID-19 pandemic. (T1057-T1059). As Plaintiff F.K. testified:

> In the fifth grade, they started in-person learning with accommodations and restrictions. Masks and then they had the distancing in the classrooms with, you know, the desks being six feet apart. They had the Plexiglass. It was, you know, again, a step in the right direction. It was very different for all students.

---

[2] References to the Record on Appeal cite to the pagination set forth in the Official Certified Record prepared by the Office of State Review.

> So for "A" being a kid that, again, he really thrives on routine, I think he expected to go back to school with what fourth grade looked like and it didn't. We tried – we have been using social stories for "A," not so much now, but in those early years. Social stories really helped "A." The school supported us with those. We worked with Dr. Jody and the parent trainer[3]. . . .
>
> I think the changes in the school and how things looked and how the school day was different was adverse to him.

(T1057-T1059). It was anticipated by the CSE that A.K. would have some issues adjusting to a new building, especially after the COVID school closure. In fact, A.K.'s IEP states "[Plaintiff F.K.] expressed concerns regarding [A.K.'s] ability to transition back to school and his adjustment to transitions between activities once we return. A goal was added to reflect this concern. [A.K.] needs to transition from one classroom activity to another when instructed to do so as part of the change in the classroom routine." (DE43). As Plaintiff F.K. testified, school personnel worked with Plaintiffs to assist in the transition to middle school. A.K.'s difficulty in the beginning of fifth grade, as a response to these major transitions was not regression, but rather part of his disability that needed to be addressed and was addressed by school personnel.

The record clearly demonstrates that the District staff, through the mandated services on the IEP, addressed A.K.'s social and emotional needs in fifth grade, such that he made meaningful progress. For instance, on his fifth grade IEP, A.K. was recommended for counseling in a small group and on an individualized basis one time per week. (DE36). Additionally, parent training, to assist the parents in addressing A.K.'s social and emotional needs was recommended fifteen times per year for one hour. (DE36). The CSE recognized that A.K. needed breaks to allow him to

---

[3] Dr. Jody was a private therapist and the parent trainer was a service provided the Plaintiffs by the District through A.K.'s IEP.

regroup and utilize his calming techniques for when he would get upset, so his IEP provided breaks as classroom accommodation. (DE45-46).

The record also demonstrates that A.K. made progress with his social and emotional skills during fifth grade. A.K. achieved his goal relating to his ability to transition between classrooms, a skill specifically included on his IEP based upon Plaintiffs' concerns about A.K. navigating middle school. (DE135). A.K. also achieved his social and emotional goal of positively responding to corrective feedback from teachers. (DE137). The District staff noted that A.K. was more willing to attend individual counseling sessions and that he had made progress throughout the year in identifying his triggers and how his behaviors impact on others. (DE137). This progress in individualized counseling was in contrast to his progress in group counseling, where he demonstrated a resistance to attending and working on issues with his peers. (*Id.*). Despite this resistance, when A.K. did engage in group counseling, he was insightful, shared his interests, and was able to provide guidance to his peers. (DE26). As his school counselor in fifth grade testified:

> [A.K.'s] demeanor…was mood dependent. There was some weeks, he would come in and he was willing to talk about things that had either triggered him or things that been [*sic*] a little bit difficult for him to navigate. Other days, he would come in very shut down and it would be hard for him to really express anything.
>
> There were times where we also offered transitional activities, so for example, if he didn't want to leave the room, he could come with the assignment that he was completing so he can finish with me. That would make him feel less anxious and then once he completed it we were able to kind of start the session."

(T105). She continued: "I think that being able to come to the counseling session even when he wasn't saying anything, I think having that quiet space to come to was beneficial for him. I think knowing he had access to the staff when he did I think was helpful for him." (T106). This testimony contradicts Plaintiffs' argument that A.K. regressed in fifth grade. Rather, the Record shows that

A.K.'s relationship to counseling was dependent upon various factors that the District's personnel were able to address in the moment so he could meaningfully participate in counseling. The SRO fully reviewed the testimony and evidence regarding A.K.'s social and emotional functioning during his fifth-grade year and appropriately determined that, given his presentation during the year, A.K. did make progress from a social and emotional standpoint. Accordingly, the SRO's further finding that the CSE's reliance on A.K.'s progress in his fifth-grade year was proper when developing his program and services for sixth grade should be upheld.

The same holds true for the SRO's evaluation of the evidence presented vis-à-vis A.K.'s academic functioning in fifth grade. The SRO took significant care to review A.K.'s report card and progress reports from the 2020-2021 school year, as well as considering the evidence of the personnel that worked with him that year. A.K.'s report card contained across the board positive ratings and comments. (DE132-133). As his teacher wrote, "We have loved watching [A.K.] progress this year. He has become a hard-working, more intrinsically motivated student. His performance across all academic areas has been wonderful." (DE133). District personnel testified to his academic progress in fifth grade, stating that A.K. made progress in the integrated co-teaching ("ICT") program recommended by the CSE. (T111-112). On his IEP progress report, A.K. achieved his academic writing goal by the March reporting period. (DE136). At the CSE meeting, it was reported that A.K. could decode well and his literal reading comprehension was strong, with more difficulty exhibited when he is required to use inferential or abstract thinking. (DE32). Further, it was reported that math was an area of strength. (DE32).

The Supreme Court's decision in *Endrew F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. 386 (2017)* provides the standard for the District's responsibility towards A.K., an obligation the District met. As the Court wrote:

To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.

The "reasonably calculated" qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials. . . . . The Act contemplates that this fact-intensive exercise will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians. Any review of an IEP must appreciate that the question is whether the IEP is *reasonable,* not whether the court regards it as ideal. . . .

That the progress contemplated by the IEP must be appropriate in light of the child's circumstances should come as no surprise. A focus on the particular child is at the core of the IDEA. The instruction offered must be "*specially* designed" to meet a child's "*unique* needs" through an "[*i* ] *ndividualized* education program." §§ 1401(29), (14) (emphasis added). An IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth. §§ 1414(d)(1)(A)(i)(I)-(IV), (d)(3)(A)(i)-(iv).

*Rowley* sheds light on what appropriate progress will look like in many cases. There, the Court recognized that the IDEA requires that children with disabilities receive education in the regular classroom "whenever possible." *Ibid.* (citing § 1412(a)(5)). When this preference is met, "the system itself monitors the educational progress of the child." "Regular examinations are administered, grades are awarded, and yearly advancement to higher grade levels is permitted for those children who attain an adequate knowledge of the course material." Progress through this system is what our society generally means by an "education." And access to an "education" is what the IDEA promises. *Ibid.* Accordingly, for a child fully integrated in the regular classroom, an IEP typically should, as *Rowley* put it, be "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." . . .

The IEP provisions reflect *Rowley* 's expectation that, for most children, a FAPE will involve integration in the regular classroom

*9005/402/4919-8591-0408v2  1/30/26*

and individualized special education calculated to achieve advancement from grade to grade. Every IEP begins by describing a child's present level of achievement, including explaining "how the child's disability affects the child's involvement and progress in the general education curriculum." § 1414(d)(1)(A)(i)(I)(aa). It then sets out "a statement of measurable annual goals ... designed to ... enable the child to be involved in and make progress in the general education curriculum," along with a description of specialized instruction and services that the child will receive. §§ 1414(d)(1)(A)(i)(II), (IV). The instruction and services must likewise be provided with an eye toward "progress in the general education curriculum." §1414(d)(1)(A)(i)(IV)(bb). Similar IEP requirements have been in place since the time the States began accepting funding under the IDEA. . . .

When a child is fully integrated in the regular classroom, as the Act prefers, what that typically means is providing a level of instruction reasonably calculated to permit advancement through the general curriculum.

*Endrew F.,* 580 U.S. at 402, (internal citations omitted)

A.K. was provided with a program in fifth grade that allowed him to advance to sixth grade. His academic functioning in school and his report cards and progress reports are evidence that A.K. was able to make meaningful progress in fifth grade and the SRO was correct in his determination of this fact. Ultimately, the SRO's reliance on A.K.'s progress in fifth grade in justifying his finding that the CSE recommended a FAPE to A.K. for the 2021-2022 school year is supported by the record and should be upheld by this Court.

**B.    The District offered A.K. a free and appropriate public education in sixth grade**

Despite Plaintiffs' claims to the contrary, the SRO correctly determined that the District recommended a FAPE to A.K. in the 2021-2022 school year. As the District noted in its Memorandum of Law in Support of its Cross-Motion, the SRO discussed the 2021-2022 school

9005/402/4919-8591-0408v2  1/30/26

-8-

year recommendation of the CSE in a detailed, fourteen single-spaced page portion of his decision. (SD10-SD24). The SRO found that objective evidence of academic progress in fifth grade, which the CSE had before it at the April 2021 CSE meeting when it developed the program for the 2021-2022 school year, was sufficient to establish that a similar program for the upcoming school year would be appropriate. (SD21-SD22).

The SRO further noted that the CSE had before it evaluative material that supported its recommendation for the 2021-2022 school year.  For instance academic testing scores in the average through very superior range, which demonstrated that A.K. was academically capable of making progress in a mainstream program, was relied upon by the CSE. (SD15, relying on D106). Further, the CSE considered assessment scores in reading, writing and math, which also demonstrated academic skills sufficient to work on grade level curricula. (SD16, relying on DE22-DE24).

The CSE developed goals for A.K. collaboratively at the April 2021 CSE meeting and the SRO correctly determined that the goals were appropriately focused on reading and social and emotional goals. (SD17, relying on T130 and DE28). The SRO recognized that A.K.'s social and emotional needs were the reasons why he needed special education programs and supports. Accordingly, the SRO reviewed the CSE's recommendation as to supports for A.K.'s emotional functioning in determining that its recommendations in that regard were correct. The SRO acknowledged that the IEP noted that A.K. had difficulty transitioning to school in 2021-2022 after the school break due to COVID-19 and that his conduct in group social skills counseling was difficult. (SD16, relying on DE26-DE27). Further, the SRO noted that the Parents' concerns relating to A.K.'s sensory input needs were discussed at the meeting. (SD16, relying on DE26). The CSE discussed the student's rigidity, low frustration tolerance and inflexibility, consistent

with his autism diagnosis, which were addressed throughout the day with classroom modifications and accommodations. (SD17, relying on T132-T134, DE26-DE27).

The SRO correctly determined that the CSE's recommendation as to individual counseling was appropriate. The SRO's determination in this regard is supported by the administrative record, especially through the testimony of the District witnesses who provided evidence that while A.K. was in the fifth grade, he had both group and individual counseling, but he participated more in his individual sessions, and that this was the basis for the CSE's recommendation to have him attend individualized counseling as he transitioned to middle school. (T109-T111; T187-T188). During the April 2021 annual review CSE meeting, the social worker who provided A.K. with group counseling in fifth grade described his participation in group counseling that year as inconsistent and that, when he did participate, he demonstrated a good understanding of emotions and coping skill (DE32). In fifth grade, A.K. benefited more from individual counseling (T103-T106; DE32). The District submits that the SRO's finding that individual counseling was, therefore, substantively appropriate should be sustained as it is a sound educational determination supported by the record.

## C.    A.K. made meaningful progress in sixth grade

Plaintiffs claim that the SRO was incorrect in concluding that A.K. made meaningful progress in sixth grade. The evidence presented at the hearing, however, sufficiently supports the SRO's determination in this regard.

From an academic standpoint, it is clear that A.K. made the progress necessary to support a finding that the CSE's recommendations in this regard were appropriate.  In the spring of his sixth-grade year, it was reported that A.K. was "a fluid and fluent reader who is able to comprehend a text." (DE6). His reevaluation testing, conducted in the spring of 2022 and reviewed at his annual

*9005/402/4919-8591-0408v2  1/30/26*

review, bore this out. On the Woodcock-Johnson IV (WJ-V), he achieved a Broad Reading score in the 53rd percentile. His reading subtest scores were variable, with a high score in the 88th percentile on the Word Attack subtest, with a low score in the Passage Comprehension subtest in the 15th percentile. (DE6). Tellingly, on the administration of the Diagnostic 3, A.K. was reading on grade level. (DE6).

Similarly in writing, A.K. was reported to be "able to create a written response to a task in content area classes." (DE7). His writing scores on the WJ-IV writing subtests were also variable, but his Broad Written Language score was in the 79th percentile. (DE7). It was noted at the CSE meeting in the spring of his sixth-grade year that A.K. was performing on grade level in terms of his writing in the classroom setting. (DE7). Math is a strength of A.K., and he was reported on grade level in mathematics at the end of sixth grade. The CSE learned that A.K. could grasp "newly taught concepts with ease and is able to apply them throughout the lessons." (DE7).

A.K.'s report card for sixth grade reflected his academic strengths. In Reading Language Arts, A.K. received a final score of 82, passing his final examination with a 71. In math, he received a 92 on his final examination and a 92 as a final grade. For Social Studies, he had a final score of 85, scoring a 75 on his final examination. In Science, which was recognized as his most difficult subject, he scored a 77 as a final score, with a passing score of 69 on this final examination. (DE127). Additionally, A.K. achieved his reading and writing goals by the end of his sixth-grade year (DE129-130). While he was not as successful in achieving his social and emotional goals, it was noted that he was showing improvement in attending to his counseling sessions, and that A.K. told staff that the reason he was resistant towards the end of sixth grade was that he "will not be attending this school anymore." (DE131).

To support their claim that the IEP recommended for A.K. was not appropriate, Plaintiffs argue that A.K. had a significant negative feelings towards school, which the CSE did not address in a meaningful way. However, school personnel testified that A.K. did not present as a student with negative school feelings while in the school building. (T354). As Julie Joshuakutty, special education chair at A.K.'s middle school, testified, "[w]e saw that he was compliant with the tasks that were presented. We saw him adjusting, participating more and more in class and becoming more accustomed to the routines, the classroom routines….The teachers were observing him smiling and interacting with students…." (T353-354). Barbara Monteiro-Grady, a school psychologist, testified that A.K.'s teachers informed Plaintiffs at a team meeting on September 28, 2021, that A.K. was not showing any signs of stress or frustration with school. (T212-213). Ms. Monteiro-Grady stated:

> although the transition for A.K. was difficult based on Mrs. K's reports, in terms of our observation of him in comparison to other student who do experience anxiety, he was not showing that level, he was not showing any of the behaviors that we observed on students who have anxiety about going to school. So although his transition was difficult, I believe he transitioned well. And we saw that throughout the year. More and more moments of him laughing, dancing, playing video games….

(T249-250). Ms. Montiero-Grady further testified that even when A.K. would shut down in class, he would respond to teacher intervention to get back on task. (T215; T250-251). Especially as it related to non-preferred tasks, A.K. could be re-engaged into working by teachers with the use of strategies such as checking in with him to verify his understanding or asking him if he wanted a break. (T.235-237). This progress was also testified to by Ms. Joshuakutty. She reported that when teachers modified how an assignment was provided to A.K., by providing him with fixed choices or scaffolding the assignment, A.K. would overcome his resistance and be able to get to work.

(T365-366). Ms. Joshuakutty definitively stated that A.K. made progress in his academic presentation during his sixth-grade year. (T367-368).

As was noted at the CSE meeting, A.K. showed a "noted improvement" from fifth grade in terms of his social and emotional functioning and A.K. was found to have "successfully improved his ability to transition to counseling" (DE8). It was reported that A.K. "developed a greater tolerance of working in groups" during his sixth-grade year. (DE17). Strategies that have been successful by the District staff in ensuring this success were setting clear behavioral expectations; and providing him with a set of options so he can have some degree of control.  This allowed him to increase his ability to interact with students in classroom setting. (DE8).

During the course of the 2021-2022 school year, Plaintiff F.K. herself reported progress. During a meeting on January 13, 2022, she stated that she was "happy that [A.K.] is beginning to open up to school support staff and is not in 'a dark place.'" (DE140). Even A.K.'s private therapist acknowledged he was making progress. In a discussion between the District's social worker and private therapist, Dr. Jodi Tarafella-Kunz, that occurred on November 30, 2021, she "acknowledges that [A.K.] is not displaying academic or behavioral issues at this time." (DE140).

The District maintains that A.K. did make progress during his sixth-grade year. The District further maintains the record fully supports this finding.  Accordingly, the SRO's decision relative to the 2021-2022 school year should not be disturbed.

**D.    The District offered A.K. a free and
       appropriate public education in seventh
       grade**

As the CSE planned for A.K.'s seventh-grade year, it considered the results of recent evaluations conducted in the spring of 2022 as part of the reevaluation process. These evaluations supported the fact that A.K. was capable of making meaningful academic progress in the program

*9005/402/4919-8591-0408v2  1/30/26*

-13-

recommended on his 2022-2023 IEP.  For instance, based upon testing, A.K.'s cognitive skills fall within the very superior range, with a General Intellectual Ability score of 135, in the 99th percentile. (DE81). On the WJ-IV, each of subtests were in the average range, other than Passage Comprehension and Sentence Writing Fluency.  (DE88). His Broad Reading score was in the 53rd percentile, his Board Written Language score was in the 70th percentile, and his Broad Mathematics score was in the 96th percentile. (DE89).

The CSE took into account the fact that, despite superior cognitive abilities and strong achievement scores, A.K. was not as successful in English and Science as he was in Math and Social Studies. The CSE acknowledged that this was based upon his social and emotional functioning. (DE18). Accordingly, the CSE considered a special class for those two subject areas, to allow A.K. to attend a class with fewer students and that would allow for information to be broken down and the curriculum to be taught at a slower pace. (DE18).

There was consideration and discussion of a therapeutic support program for A.K. at the CSE meeting in the spring of 2022, so as to address his emotional needs in a more structured setting. However, the CSE recognized the obligation of the CSE to provide a free and appropriate public education in the least restrictive environment. (DE18). Taking into account the success A.K. was showing academically and the emotional progress seen in the school setting, the CSE provided for individual psychological counseling (2x10 day cycle for 42 minutes), small group counseling twice per month, parent counseling and training fifteen hours for the school year and an occupational therapy consultation for District staff, five times a year, for 30 minutes each session at the District's middle school. (DE10).

The IDEA provides that the FAPE the District is required to offer be in the least restrictive environment. 20 U.S.C. §1412(a)(5)(A); 34 C.F.R. 300.114(a)(2)(i), 300.116(a)(2); 8 NYCRR

200.6(a)(1); *see Walczak,* 142 F.3d at 130. A least restrictive environment ("LRE") is "one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled." *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 535 (3d Cir. 1995). However, "while mainstreaming is an important objective, we are mindful that the presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to handicapped students." *P. v. Newington Bd. of Educ.*, 546 F.3d 111, 119 (2d Cir. 2008) (internal marks and citations omitted). The "tension between the IDEA's goal of providing an education suited to a student's particular needs and its goal of educating that student with his non-disabled peers as much as circumstances allow" dictates a "case-by-case analysis in reviewing whether both of those goals have been optimally accommodated under particular circumstances." *Id.* (internal marks and citations omitted).

The Second Circuit Court of Appeals uses a two-pronged test to determine whether a school district has met the LRE mandate. First, the Court inquires whether the student can "be satisfactorily educated in the regular classroom, with the use of supplemental aids and services." *P. v. Newington Bd. of Educ.*, 546 F.3d at 121 *as cited in M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 144-45 (2d Cir. 2013). To answer that question, the Court considers: "(1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom; (2) the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative effects of the inclusion of the child on the education of the other students." *P. v. Newington Bd. of Educ.*, 546 F.3d at 120 *as cited in M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 145 (2d Cir. 2013). If the program in question does recommend

*9005/402/4919-8591-0408v2  1/30/26*

-15-

the student be placed into a special education class or classes, the Court then considers "whether the school has included the child in school programs with nondisabled children to the maximum extent appropriate." *P. v. Newington Bd. of Educ.*, 546 F.3d at 120 (2d Cir. 2008) *as cited in M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 145 (2d Cir. 2013) (internal quotations omitted). The ultimate goal, as the Supreme Court noted, is the development of a program "with an eye toward 'progress in the general education curriculum.'" *Endrew F.,* 580 U.S. at 401, *citing* 20 U.S.C. §1414(d)(1)(A)(i)(IV)(bb).

The SRO discussed the CSE's recommendation for the programming for the 2022-2023 school year over six single-spaced pages. (SD24-SD30). As the SRO noted, the school personnel's testimony regarding his emotional presentation in school and his academic progress was sufficient reason for the CSE to continue to recommend a public-school setting with special education supports. The District submits that the SRO's analysis regarding the 2022-2023 school year and the finding that the CSE recommended a FAPE in the 2022-2023 school year should be upheld.

## III.    CONCLUSION

The District submits that each of the arguments made by Plaintiffs' in their Cross-Motion are without merit and that, as set forth in the District's Cross-Motion, the SRO's well-reasoned and detailed decision deserves this Court's deference.  Accordingly, the District respectfully requests that this Court issue a judgment in its favor on its Cross-Motion for Judgment on the Administrative Record.

*9005/402/4919-8591-0408v2  1/30/26*

Dated:    White Plains, New York
          January 30, 2026

**KEANE & BEANE, P.C.**

By:    *Susan E. Fine*
       Susan E. Fine
       Attorneys for Defendant
       445 Hamilton Avenue, 15th Floor
       White Plains, New York 10601
       (914) 946-4777

*9005/402/4919-8591-0408v2  1/30/26*